**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

| | |
|---|---|
| **L.O., a Sex Trafficked Individual,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**WYNDHAM HOTELS AND RESORTS, INC.; RAMADA WORLDWIDE INC.; L A B H INC.; DAYS INN WORLDWIDE INC.; SUN NORFOLK LLC; G6 HOSPITALITY LLC; G6 HOSPITALITY PROPERTY LLC; MOTEL 6 OPERATING L.P.; CHOICE HOTELS INTERNATIONAL, INC.; LIAM LLC; THE RAMSEY-WHITE COMPANY, L.C.; R & J PETRO, INC.; JOHN DOES 1-100 (names being fictitious); and ABC CORPORATIONS 1-100 (names being fictitious),**<br><br>**Defendants.** | **Civil Action No.: 2:26-cv-________**<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

Plaintiff L.O., by and through the undersigned counsel, for her complaint against the Defendants, Wyndham Hotels and Resorts, Inc., Ramada Worldwide, Inc., L A B H, Inc., Days Inn Worldwide Inc., Sun Norfolk LLC, G6 Hospitality LLC, G6 Hospitality Property LLC, Motel 6 Operating, L.P., Choice Hotels International, Inc., LIAM LLC, The Ramsey-White Company, L.C., R & J Petro, Inc., John Does 1-100 (names being fictitious); and ABC Corporations 1-100 (names being fictitious) (collectively, "Defendants"), and alleges as follows:

## Preliminary Statement

1. This case arises from the organized sex trafficking of Plaintiff L.O.[1] in Virginia and seeks redress for the harm she suffered as a result of that exploitation. Plaintiff L.O. brings these allegations to hold accountable those who enabled, profited from, and disregarded the trafficking that consumed years of her life. Plaintiff L.O. seeks damages from defendants who profited from her sex-trafficking through a venture or ventures that defendants enabled to operate with impunity and ensured that Plaintiff L.O.'s exploitation could continue.

2. The defendants are hotel and motel operators, and their respective franchisors, who knowingly benefited from L.O.'s exploitation by renting rooms, supplying services, amenities, and facilities, and maintaining policies and practices that made certain hotels and motels into safe harbors for sex trafficking. At each location, L.O.'s traffickers received favorable treatment beyond what an arms-length transaction would entail. At these hotels and motels, L.O. was forced, under the control of her traffickers—identified herein as Tom Roe and Jake Roe—and their associates, to engage in commercial sex acts with near-daily frequency. Not only did the defendants ignore pervasive and obvious indicators of sex trafficking, they participated in concert with one another to benefit from human trafficking, including L.O.'s trafficking, while dispersing the risk of detection among their respective ventures. Doing so increased occupancy, revenue, brand visibility, and related royalties.

3. Tom Roe and Jake Roe coerced L.O. into a life of involuntary sexual servitude through violence and drug dependency. They controlled her movements, deprived her of money

---

[1] A pseudonym is used because the Plaintiff is a victim of sexual abuse and of a criminal enterprise such that disclosure could lead to disclosure could lead to danger, stigma, or retaliation. *See infra* n.2 and accompanying text. Plaintiff intends to interpose a formal motion to proceed under a pseudonym for this litigation. Similarly, a pseudonym is used for Plaintiff's traffickers (i.e., Tom Roe and Jake Roe) to provide additional protection for Plaintiff.

and autonomy, and enforced compliance through threats and physical abuse. L.O. feared severe harm if she resisted, and her traffickers' methods ensured she could not safely escape their control.

4. Defendants, through their hotels, motels, and franchise relationships, repeatedly provided the venues and logistical support for Plaintiff L.O.'s exploitation, turning a blind eye to the red flags of trafficking when they knew or should have known that their support benefited a venture that engaged in trafficking. Defendants are liable under federal and state law for the harms they helped cause.

**Parties**

5. Plaintiff, L.O. ("L.O." or "Plaintiff"), is a citizen of the State of Georgia. Due to the sensitive, private, and demonstrably retaliatory nature of the allegations contained herein, Plaintiff requests this district court grant a protective order under Federal Rule of Civil Procedure 26(c) to permit her to proceed under a pseudonym and to ensure Defendants keep Plaintiff's identity confidential throughout the pendency of the lawsuit and thereafter.[2] L.O. filed a motion to proceed under a pseudonym at the time of filing this Complaint or shortly after completing service of the Complaint on Defendants.

6. Defendant, Wyndham Hotels and Resorts, Inc. ("Wyndham Hotels"), is a corporation headquartered in Parsippany, New Jersey, organized under the laws of the State of

[2] In addition to being a victim of a "severe form[] of trafficking" as it is defined under 22 U.S.C. § 7102(11), L.O. was also "caused to engage in commercial sex act[s]" for a decade. *See* 18 U.S.C. § 1591(a). Federal law considers victims of sex trafficking to be the victims of organized crime, entitled to witness protection. *See* 18 U.S.C. § 1594(g) ("Witness Protection – Any violation of this chapter shall be considered an organized criminal activity or other serious offense for the purposes of application of chapter 224"). In cases where the Plaintiff has demonstrated a need for pseudonymity, the district court should use its powers to manage pretrial proceedings under Fed. R. Civ. P. 16(b) and to issue protective orders limiting disclosure of the party's name under Fed. R. Civ. P. 26(c) to preserve the party's anonymity to the greatest extent possible without prejudicing the opposing party's ability to litigate the case. *See James v. Jacobson*, 6 F.3d 233, 238-239 (4th Cir. 1993) (recognizing that the Fourth Circuit permits anonymity "to preserve privacy in a matter of sensitive and highly personal nature; whether identification poses a risk of retaliatory physical or mental harm to the requesting party or even more critically, to innocent non-parties; the ages of the persons whose privacy interests are sought to be protected."; *see, e.g. A.D. v. Wyndham Hotels & Resorts*, No. 4:19-CV-120 (E.D. Va. Mar. 20, 2020) (finding sex trafficking victim plaintiff met the standards set by the Fourth Circuit to proceed under a pseudonym).

Delaware and authorized to do business in the Commonwealth of Virginia. Wyndham Hotels owns the Wyndham Hotels brand and the Ramada Hotels brand.

7. Defendant, Ramada Worldwide Inc. ("Ramada Worldwide"), is a corporation headquartered in Parsippany, New Jersey, organized under the laws of the State of Delaware and authorized to do business in the Commonwealth of Virginia. Upon information and belief, Ramada Worldwide is a company owned by Wyndham Hotels.

8. Defendant, L A B H Inc. d/b/a Ramada Limited Norfolk ("LABH"), is a hotel venture located at 515 North Military Highway, Norfolk, Virginia 23502. LABH is a corporation organized under the laws of the Commonwealth of Virginia. Upon information and belief, at all relevant times, this hotel was owned, operated, maintained, and controlled, at least in part, by LABH d/b/a Ramada Limited Norfolk.

9. Defendant, Days Inn Worldwide Inc. ("Days Inn Worldwide"), is a corporation headquartered in Parsippany, New Jersey, and organized under the laws of the State of Delaware. Upon information and belief, Days Inn Worldwide, is a company and brand owned by Wyndham Hotels.

10. Defendant, Sun Norfolk LLC d/b/a Days Inn by Wyndham Norfolk Military Circle ("Sun Norfolk"), is a hotel venture located at 5701 Chambers Street, Norfolk, Virginia 23502. Sun Norfolk is a corporation organized under the laws of the Commonwealth of Virginia. Upon information and belief, at all relevant times, this hotel was owned, operated, maintained, and controlled, at least in part, by Sun Norfolk d/b/a Days Inn by Wyndham Norfolk Military Circle.

11. Defendant, G6 Hospitality LLC d/b/a Motel 6 Norfolk, its successors and assigns, ("G6 Hospitality"), is a hotel venture located at 853 North Military Highway, Norfolk, Virginia 23502, from 2012 through present. G6 Hospitality is a limited liability company headquartered in

Carrollton, Texas 75007, and organized under the laws of the State of Delaware. It owns/owned certain locations and franchises in others. Upon information and belief, at most or all relevant times, the premises at 853 North Military Highway was owned and operated by G6 Hospitality, as the owner and franchisor of the Motel 6 and Studio 6 brands in the United States and Canada, with approximately 1,500 locations. It offers/offered property management, call center, distribution, reservations, marketing, sales, procurement, and training expertise to its proprietary locations, its franchisees, and employees.

12. Defendant, G6 Hospitality Property LLC d/b/a Motel 6 Norfolk, its successors and assigns ("G6 Property"), is a hotel venture located at 853 North Military Highway, Norfolk, Virginia 23502, from 2012 through present. G6 Property is a limited liability company headquartered in Carrollton, Texas 75007, and organized under the laws of the State of Delaware. It owns/owned certain locations and franchises in others. Upon information and belief, at most or all relevant times, the premises at 853 North Military Highway was owned and operated by G6 Property as the owner and franchisor of the Motel 6 and Studio 6 brands in the United States and Canada, with approximately 1,500 locations. It offers/offered property management, call center, distribution, reservations, marketing, sales, procurement, and training expertise to its proprietary locations, its franchisees, and employees.

13. Defendant, Motel 6 Operating L.P. d/b/a Motel 6 Norfolk, its successors and assigns, ("Motel 6"), is a hotel venture located at 853 North Military Highway, Norfolk, Virginia 23502, from 2012 through present. Motel 6 is a limited partnership headquartered in Carrollton, Texas 75007, and organized under the laws of the State of Delaware. It owns certain locations and franchises in others. Upon information and belief, at most or all relevant times, the premises at 853 North Military Highway was owned and operated by Motel 6 as the owner, operator, and franchisor

of the Motel 6 and Studio 6 hotels in the United States and Canada, with approximately 1,500 locations. It offers/offered property management, call center, distribution, reservations, marketing, sales, procurement, and training expertise to its proprietary locations, its franchisees, and employees.

14. Defendant, Choice Hotels International, Inc. ("Choice Hotels"), is a corporation headquartered in Bethesda, Maryland, and organized under the laws of the State of Delaware. Upon information and belief, Choice Hotels owns the Econo Lodge brand, among others.

15. Defendant, Liam LLC d/b/a Econo Lodge Airport ("Liam"), is a hotel venture located at 3343 North Military Highway, Norfolk, Virginia 23502 from approximately 2012 through the present. Liam is a limited liability company organized under the laws of the Commonwealth of Virginia. Upon information and belief, at all relevant times, it was owned, operated, maintained, and controlled, at least in part, by Liam d/b/a Econo Lodge Airport.

16. Defendant, The Ramsey-White Company, L.C. d/b/a Studios & Suites 4 Less ("Ramsey-White"), is a hotel venture located at 717 South Military Highway, Virginia Beach, Virginia 23464, from approximately 2012 through present. Ramsey-White is limited liability company organized under the laws of the Commonwealth of Virginia. Upon information and belief, at all relevant times, it was owned, operated, maintained, and controlled at least in part, by Ramsey-White d/b/a Studios & Suites 4 Less.

17. Defendant, R & J Petro, Inc. d/b/a Studios & Suites 4 Less ("R & J Petro"), is a hotel venture located at 717 South Military Highway, Virginia Beach, Virginia 23464, from approximately 2012 through present. R & J Petro is a corporation organized under the laws of the Commonwealth of Virginia. Upon information and belief, at all relevant times, it was owned, operated, maintained, and controlled at least in part, by R & J Petro d/b/a Studios & Suites 4 Less.

18. Defendants John Does 1-100 are currently unknown. The true names and capacities of Defendants John Does 1-100 are unknown to the Plaintiff at the time of filing this Complaint, and therefore, sues said Defendants by such fictitious names and will ask leave of court to amend this Complaint to show their true names or capacities when the same have been ascertained. Plaintiff is informed and believes and therefore alleges that each of the John Does 1-100 Defendants are, in some manner, responsible for L.O.'s injuries.

19. Defendants ABC Corporations 1-100 are currently unknown. The true names and capacities of Defendants ABC Corporations 1-100 are unknown to the Plaintiff at the time of filing this Complaint, and therefore, sues said Defendants by such fictitious names and will ask leave of court to amend this Complaint to show their true names or capacities when the same have been ascertained. Plaintiff is informed and believes and therefore alleges that each of the ABC Corporations 1-100 Defendants are, in some manner, responsible for L.O.'s injuries.

## **Jurisdiction and Venue**

20. This Court has original and supplemental subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 with respect to claims under 18 U.S.C. § 1595(a), pursuant to 28 U.S.C. § 1332 with respect to the parties and amount in controversy, and pursuant to 28 U.S.C. § 1367 with respect to L.O.'s state law claims arising from the same common nucleus of facts such that the state claims are so related to the federal claims that they form part of the same case or controversy.

21. The Court has general personal jurisdiction over the Defendants either because they are natural persons who reside in Virginia or regularly conduct business in Virginia or they are business entities "at home" in Virginia by incorporation or maintenance of their principal places of business in Virginia. Otherwise, the Court has specific personal jurisdiction over the Defendants

because the Defendants, through their hospitality operations and other commercial activities within Virginia, targeted Virginia and purposefully availed himself, herself, or itself of the privilege of conducting business within Virginia. For the reasons explained below, L.O.'s claims arise out of or relate to Defendants' contacts and conduct within Virginia.

22. Venue is proper in the Norfolk Division of this District under 28 U.S.C. § 1391(b) because L.O. was trafficked in this District, the acts giving rise to this action occurred in this District, and at least one Defendant resides in this District and is subject to the Court's personal jurisdiction. 28 U.S.C. § 1391(b)(1), (2), (3). Moreover, venue is proper within the Norfolk Division of this District because the hotels and motels where L.O. was trafficked are in the Cities of Virginia Beach and Norfolk, which are within the Norfolk Division of the Eastern District of Virginia. 28 U.S.C. § 127(a); Local Civil Rule 3(B)(3).

## I. FACTS

### A. The Defendants' general notice of Sex trafficking in their hotels and motels

23. At all times material to the complaint, the Defendants knew how to identify sex trafficking at their properties, knew how to advise staff members to identify trafficking victims at their properties, and understood the general type of harm trafficking entails.

24. Virginia has for several years sounded the bell on sex trafficking. The Commonwealth of Virginia Attorney General's Office has published "warning signs" for noticing sex trafficking[3]:

[3] The Office of Attorney General of the Commonwealth of Virginia, in conjunction with the Polaris Project, provided these warning signs for people and businesses of Virginia to notice issues of human trafficking. https://www.oag.state.va.us/programs-outreach/human-trafficking?view=article&id=220:identifying-human-trafficking&catid=14

a. Unusual/poor living conditions- including not being able to come and go freely, being severely underpaid, owing a large amount of debt, and unusually high security measures surrounding work and home.

b. Poor mental health or abnormal behavior—including being fearful, anxious, depressed, or submissive, an unusual fear of law enforcement, often avoids eye contact.

c. Poor physical health—including malnourishment and signs of physical abuse.

d. Lack of control—including not controlling money and identification, lack of knowledge regarding residence, and the inability to speak for himself/herself (relies on third-party or translator).

25. Other states have published similar information. For example, the Texas Attorney General's Office has long published "red flags" for noticing sex trafficking:

a. Person seems overly fearful, submissive, tense, or paranoid;

b. Person is deferring to another person before giving information;

c. Person has physical injuries or branding such as name tattoos on face or chest, tattoos about money and sex, or pimp phrases;

d. Clothing is inappropriately sexual or inappropriate for weather;

e. Minor is unaccompanied at night or falters in giving an explanation of who they are with and what they are doing;

f. Identification documents are held by another;

g. Person works long or excessive hours or is always available "on demand";

h. Overly sexual for age or situation; and

i. Person is not free to come and go.

26. Further, the Commonwealth of Virginia's Office of the Attorney General also identifies the United States Department of Homeland Security's ways to identify sex trafficking, which has long published the following ways of identifying sex trafficking:

a. Does the person appear disconnected from family, friends, community organizations, or houses of worship?

b. Has a child stopped attending school?

c. Has the person had a sudden or dramatic change in behavior?

d. Is a juvenile engaged in commercial sex acts?

e. Is the person disoriented or confused, or showing signs of mental or physical abuse?

f. Does the person have bruises in various stages of healing?

g. Is the person fearful, timid, or submissive?

h. Does the person show signs of having been denied food, water, sleep, or medical care?

i. Is the person often in the company of someone to whom he or she defers? Or someone who seems to be in control of the situation, e.g., where they go or who they talk to?

j. Does the person appear to be coached on what to say?

k. Is the person living in unsuitable conditions?

l. Does the person lack personal possessions and appear not to have a stable living situation?

m. Does the person have freedom of movement? Can the person freely leave where they live? Are there unreasonable security measures?

27. This information is substantially similar to information published by the Attorney Generals in Maryland and New Jersey. The Maryland Governor and Department of Human Services have long published warning signs for identifying sex trafficking.[4] The New Jersey Attorney General's office has released important information for hotel and motel owners and managers to train their staff to recognize human trafficking.[5]

28. These commonsense indicators should have been obvious to the Defendants, who also receive information and participate in trade organization events designed to raise awareness of sex trafficking and its "red flags" at their properties.

**B. The sex-trafficking indicia, or "red flags," available to Defendants from L.O.'s victimization by their properties**

29. In the ordinary course of business, practiced by all Defendants, front desk personnel and other employees at Defendants' locations observed that L.O. exhibited the "red flags" and other obvious signs of being a victim of trafficking in their daily interactions with her. Each franchisee defendant required guests to check in to their rooms, provided room cleaning services, provided parking, lobbies, and other common areas for guest convenience. Each franchisor defendant required its franchisee to provide the same. Both franchisee and franchisors required staff to observe and act on conduct likely to harm guests. No reasonable person would have failed to conclude that L.O. was likely a trafficking victim. No hotel employee exercising due diligence or even slight care would have continued to accommodate L.O.'s traffickers, given the following routine and consistent indicia exhibited by her circumstances at each and every location:

---

[4] https://dhs.maryland.gov/child-protective-services/sex-trafficking/recognize-the-signs/

[5] https://www.nj.gov/oag/dcj/humantrafficking/downloads/NJ-Human-Trafficking-Brochure.pdf

a. Tom Roe and Jake Roe, as well as their associates, transported L.O. to each location and placed her in a rented room, frequently without registration for her.

b. Tom Roe and Jake Roe, as well as their associates, would stand guard outside the rooms or be close by while obviously armed;

c. Tom Roe and Jake Roe, or their associates, disciplined, degraded, abused, threatened, and dehumanized their sex trafficking victims in the hallways and public areas;

d. Unregistered male visitors entered L.O.'s room (and other involved rooms) one-by-one throughout the day, either after walking by the front desk, the front office, or through a back door left unlocked, but always in full view of the hotel's cameras;

e. Tom Roe and Jake Roe, or their associates, would collect the cash just outside the front door of the room or near the rooms used for their sex-trafficking enterprise;

f. Tom Roe and Jake Roe, or their associates, frequently prevented hotel staff from entering the rooms while sex trafficking was occurring;

g. Tom Roe and Jake Roe, or their associates, frequently prevented their victims from escaping;

h. L.O. was emaciated;

i. L.O. was never allowed to speak to other people or with hotel staff;

j. L.O. was rarely left without an escort, either Tom Roe or Jake Roe, or their associates;

k. L.O. dressed provocatively;

l. L.O. was visibly drugged when entering and exiting the hotel or walking in its public areas, and it would have been obvious to anyone that she was incapable of consenting to sexual activity;

m. L.O. was traveling with others, many of whom, like her, were emaciated, showed signs of heavy drug usage, were dressed provocatively, and exhibited bruises and other signs of physical violence;

n. L.O.'s rooms presented clear signs of commercial sex trafficking throughout, such as multiple used condoms and wrappers discarded in the trash, bodily fluids on the bedding and towels, and commercial sex and drug paraphernalia.

30. On at least a dozen occasions, the traffickers booked multiple rooms as a block, typically under Tom Roe's or Jake Roe's names, and paid for them separately from L.O. and the other occupants.

### C. <u>How the Traffickers used Defendants' hotel ventures to traffic L.O. for their own benefit and the benefit of Defendants</u>

31. Although the trafficking of L.O. began in 2012, L.O. recalls the events in greatest detail from approximately 2014 through 2019. L.O.'s ordeal began in 2012 when she moved from New York to Virginia with her husband. After her husband was incarcerated, she lost her home and her support. Tom Roe and Jake Roe, along with their associates, took advantage of her vulnerability. As a young woman, L.O. was targeted by traffickers Tom Roe and Jake Roe, along with their associates, who presented themselves as protectors while recruiting, isolating, and controlling her for the purpose of commercial sexual exploitation. Operating as part of an

organized trafficking enterprise, they exploited L.O.'s vulnerability under the guise of care and support.

32. Throughout the trafficking period, L.O. endured cruel, degrading, and dehumanizing treatment at the hands of Tom Roe, Jake Roe, and their associates. They drugged her and threatened her with serious physical and emotional harm and imprisonment if she refused to comply. They compelled her to engage in commercial sex acts by means of threats of serious harm, physical violence, intimidation, psychological manipulation, and the creation and manipulation of drug dependency. They deprived her of money, freedom of movement, and autonomy to ensure compliance. They routinely dehumanized L.O., both publicly and privately, to keep her compliant. They used these methods for the duration of the trafficking. Based on her experience with Tom Roe and Jake Roe, L.O. believed that failing to perform sex acts and generate money would result in serious harm, and she reasonably feared such consequences throughout the trafficking period.

33. At no time was she able to leave. L.O.'s traffickers escalated their abuse when she attempted to escape. She reasonably feared severe consequences if she resisted, and suffered lasting physical and psychological injuries from their abuse and the daily conditions in which she lived. For several years, Tom Roe and Jake Roe, and their affiliates and associates, trafficked L.O. in the Commonwealth of Virginia, in the hotels and motels identified as belonging to and operated by Defendants.

34. During the entirety of her trafficking, Tom Roe, Jake Roe, or their associates were always nearby—usually waiting in the parking lots of Defendants' properties to control L.O. and keep their many customers in line. L.O. was not allowed to leave the hotels without one of the

traffickers accompanying her, and she was never given money for her own use. If she was permitted to use a phone, her traffickers installed a location tracker.

35. When L.O. failed to make enough money or disobeyed, Jake Roe subjected her to mental torment while Tom Roe physically abused her. Some of the abuse occurred in public view, including in full view of Defendants' staff. No one intervened.

36. The physical pain, emotional trauma, and public humiliation that L.O. endured—often observable to Defendants and their agents and employees—caused her mental and physical health to deteriorate. Tom Roe and Jake Roe relentlessly degraded L.O., causing her to feel less than human—almost animal-like. The continual abuse served to keep her compliant and trapped in forced commercial sex. The abuse was so relentless that L.O. began to believe that she deserved it and internalized the traffickers' insults.

37. Tom Roe and Jake Roe, along with their associates, were usually armed.

38. At the traffickers' direction, L.O. moved between different hotel locations. Tom Roe and Jake Roe would secure the rooms at the hotels—sometimes with staff already having rooms set aside for them.

39. Tom Roe or Jake Roe procured the hotel rooms and typically paid in cash; on occasion, rooms were placed in L.O.'s name. The rooms were generally located in the back and away from regular hotel guests. Once the rooms were procured, Tom Roe or Jake Roe placed L.O. inside, forbade her from leaving, and sent customers to her, for commercial sex.

40. Throughout the day, men entered and exited through the front door and proceeded to L.O.'s room in plain view of the front office and hotel cameras. L.O. was forced to provide commercial sex acts for as many as ten men in a single day. After each encounter, Tom Roe, Jake Roe, or a designated associate, typically came to the room to collect the cash.

41. The traffickers typically stationed themselves in the hallway or nearby parking lot to monitor the operation and collect payment. They remained in plain view, armed and clearly monitoring the area. L.O. regularly saw them as customers entered and left her room.

42. Tom Roe and Jake Roe controlled the money at all times. L.O. depended on them for basic necessities such as food and personal hygiene items. She was never left alone, and any purchase had to be made by a trafficker while accompanying her.

43. The traffickers supplied narcotics to which L.O. became addicted, and they at times withheld the drugs to ensure her continued compliance. L.O. was always afraid to leave. The traffickers' sustained degradation, dehumanization, and physical abuse kept her under their control.

44. The traffickers took frequent pictures of L.O. and used them to advertise her for commercial sex online. These ads would eventually lead the commercial sex customers, or "johns" to the Defendants' hotels.

45. Eventually, Jake Roe took L.O. to North Carolina, away from Tom Roe, where L.O. was ultimately able to escape from Jake Roe, too. However, L.O. was left destitute and housing-insecure.

46. Without any ability to support herself as she tried to reassimilate into society, L.O. sought and received drug and alcohol rehabilitation treatment. First she was treated in-patient then transitioned to a halfway house. Determined to regain her autonomy after her treatment concluded, L.O. worked minimum wage jobs while sleeping in her car. She occasionally stayed in shelters.

47. Even though she had no stable housing, L.O. returned to school through an online program. When she got behind on her bills, the title company repossessed her car with all her worldly possessions in it. She moved to Georgia, suffered a medical emergency and came to the

attention of a hospital case worker, who successfully connected her with social services. By the end of 2023, L.O. obtained secure housing and the ability to attend classes full-time.

48. Each Defendant substantially participated in L.O.'s exploitation, directly or indirectly, by assisting, supporting, and facilitating the commercial sex acts under circumstances where they either knew or should have known that the commercial sex acts were involuntary. Each of the Defendants knowingly benefitted financially from their participation, with actual knowledge, constructive knowledge, willful blindness, or reckless indifference to the fact that L.O. was being trafficked and compelled into commercial sex servitude.

49. Defendants, through their agents and employees, permitted the trafficking conduct and caused the accompanying physical and mental abuse to continue on their premises. At some of the locations, Defendants' agents, servants, or employees specifically witnessed the control and abuse exercised by Jake Roe, Tom Roe, and their associates.

**D. <u>The Defendants' tacit agreement with L.O.'s Traffickers, and their specific acts and omissions in furtherance of the ventures that profited from L.O.</u>**

**a. *The Defendants' and traffickers' modus operandi***

50. Each franchise venture (franchisee and franchisor) reserves the right to deny service and refuse accommodation requests for reasonable grounds. In furtherance of this right, each franchise venture keeps a record of persons to whom service should be denied.

51. Tom Roe and Jake Roe rotated L.O. through the same group of hotels on a recurring, near-monthly cycle. Although L.O. was taken to private residences and other hotels on a few occasions, the vast majority of her trafficking occurred at Defendants' properties. As stated above, these hotels sometimes already had rooms set aside for them.

52. This small set of properties occupies a 4.5-mile section of Highway 13 between Norfolk and Virginia Beach. Three of the properties sit within a few blocks of each other.

53. L.O.'s traffickers followed an "in call" trafficking pattern. Instead of sending victims to "johns," with the attendant risk of escape, the traffickers held victims in a location to receive "johns." The "in call" trafficking pattern more effectively restrains the victim, and reduces the plausibility that third party observers would misidentify the victim as a willing participant in commercial sex. Essential to an "in call" trafficking pattern is a secure location.

54. The trafficking conduct occurred between dusk and dawn.

55. As a result of this constant rotation among a small set of properties, and the employees and owner/operators at each Defendant hotel quickly became familiar with Tom Roe, Jake Roe, and their associates, and the consistent pattern of trafficking of L.O. and other women.

56. Upon information and belief, a material share of room revenue at these properties was generated by prostitution-related rentals. The hotels' business model depended on commercial sex patronage. By extension, the franchisors' business model depended on commercial sex patronage. Because Virginia law limits how long a hotel guest may remain before acquiring tenancy rights, and to avoid scrutiny from local law enforcement, and to reduce the risk of complaints from customers not involved in commercial sex, Defendants tacitly agreed that the sex-trafficking groups could rotate among nearby properties so that each location could avoid extended stays, minimize attention from law enforcement, minimize bad publicity, and still rely on the traffickers' repeated return and thereby enjoyed a predictable stream of recurring room revenue.

57. By staggering the stays across multiple hotels, the traffickers—and the participating hotels—reduced the risk of detection while providing the "johns" a safe harbor conveniently located on a major commercial artery of Hampton Roads. The arrangement also ensured the trafficking victims remained isolated and enthralled to their traffickers.

58. Central to the traffickers' ability to maintain profitability while rotating the site of their trafficking was the use of hotel and motel internet connectivity. The traffickers used interactive computer services through hotel/motel Wi-Fi to plan stays, advertise L.O.'s availability for commercial sex (among other victims) on backpages.com or skipthegame.com, coordinate with "johns," recruit other victims, maintain contact with one another, acquire drugs and other supplies needed for the venture.

59. Despite their control over the traffickers' use of interactive computer services at the various hotels and motels, the Defendants never interfered with the traffickers' venture.

60. Upon information and belief, each Defendant hotel owner/operator utilized interactive computer services for things like booking, customer complaints and notes, customer review surveys, banking, and accounting, among other things. The routine recordation of these uses created data.

61. Each hotel franchise venture (franchisee and franchisor) used interstate interactive computer services to control room reservations, clear financial transactions for the rooms, asses and collect other payments and fees, communicate with other Defendants about bookings, engage in online advertisements, push loyalty programs, troubleshoot guest complaints, read reviews about the hotel, collect and analyze customer and guest surveys, communicate standards and reviews, and perform assessments about the hotel and the compliance with hotel standards, among other things.

62. Each Defendant hotel franchisor required its franchisee to obtain licenses to use specific interactive computer services and programs.

63. Each Defendant hotel franchisor required its franchisee to collect and remit data for the benefit of the franchisor.

64. Each Defendant hotel franchisor required its franchisee to furnish the traffickers with internet access under certain terms of service that permitted tracking and oversight of the traffickers' use of internet.

65. Each Defendant hotel franchisor reserved for itself the power to collect, analyze, and share information derived from the traffickers' stays at their respective franchisees' locations. Conversely, each Defendant hotel franchisor exercised the discretion to not collect, or not analyze, or not share information derived from the traffickers' stays at their respective franchisees' locations.

66. Despite their superior vantagepoint from which a reasonable franchisor exercising due diligence identifies likely traffickers moving among its franchisees, the franchisor Defendants never ordered their franchisees to alert law enforcement or even deny service to the traffickers and their associates. The Defendant franchisors' conduct, their policies and practices involved in this superior vantagepoint occurred irrespective of the events at any particular franchised location.

67. These parallel and mutually reinforcing practices constituted, upon information and belief, an informal association or tacit agreement among the hotels—their owners, operators, and franchisors—to facilitate and knowingly profit from the traffickers' venture with knowledge or constructive knowledge of the trafficking conduct; or to knowingly profit in their own respective ventures with knowledge or constructive knowledge of the trafficking conduct, or in want of slight care or reckless indifference of the harm to L.O. and similarly situated persons.

**b. *Studios & Suites 4 Less***

68. Upon information and belief, at all relevant times the Studios & Suites 4 Less property was owned, operated, or controlled by Defendants, Ramsey-White Company LC and/or R & J Petro, Inc., or one of their affiliates (the "Studio 4 Less Defendants"). At all relevant times,

the Studio 4 Less Defendants, its agents and employees, acted within the scope of their agency or employment.

69. The Studios & Suites 4 Less Defendants formed a business venture that participated in Tom Roe's and Jake Roe's sex trafficking scheme. The venture included the front desk workers, housekeeping and janitorial staff, maintenance workers, owners, account personnel, and managers.

70. L.O. was first trafficked at the Studios & Suites 4 Less in or around early 2014 until late fall 2019. L.O. was originally brought to this location by Jake Roe to meet Tom Roe when she had nowhere else to go.

71. Studios & Suites 4 Less was Tom Roe's and Jake Roe's main location and was treated as the primary headquarters for the sex-trafficking enterprise.

72. Throughout the trafficking period, the Studio 4 Less Defendants maintained a continuous, repeat business relationship with Tom Roe and Jake Roe, renting rooms to them to facilitate, at a minimum, a scheme they knew or should have known involved coerced women into sex trafficking.

73. The Studio 4 Less property contains a neighborhood grocery store, run by the same people as the lodgings. They frequently interacted with L.O.'s traffickers and sold them products for their venture.

74. On several occasions, L.O. was forced to provide sexual services to the night manager at the Studios & Suites 4 Less property in exchange for permitting the sex-trafficking enterprise to continue at the location.

75. Tom Roe and Jake Roe would force L.O. to offer sexual services to the night desk manager in the back office in exchange for a free room. The night desk manager would routinely look for L.O. claiming that she "owed him" for the free room and forced her to have additional

sexual services with him. Occasionally, Tom Roe and Jake Roe would let the night desk manager beat her while L.O. was forced to perform sexual services on the night desk manager.

76. The night manager would make similar demands on other trafficking victims.

77. Additionally, L.O. suffered severe violence at or connected to this location. Tom Roe struck her with his car when she did not earn enough money from a customer.

78. On another occasion, Tom Roe attacked L.O. with a crowbar, slashing her throat and leaving a permanent scar. L.O. reported the incident to police, but no action followed.

79. At all relevant times, public areas of this hotel, including the hallways and office area, were monitored by camera.

80. The property's layout required guests to pass the front desk or office area to access the rooms, affording hotel personnel plain view of and direct exposure to the trafficking activity and its obvious indicators.

81. The hotel was, and upon information and belief, still is an obvious haven for sex trafficking as almost all of the clientele were engaged in the sex trade.

82. Despite all of the information available to the Studio 4 Less Defendants, the trafficking of L.O. continued at their location through 2019. Studio 4 Less Defendants permitted the venture to continue so they could continue benefiting financially from it.

83. Given their knowledge or opportunity to apprehend the situation, it was incumbent on Studio 4 Less Defendants to take reasonable measures against providing material support, lodging, or other aid or comfort to Tom Roe and Jake Roe and their venture—instead of playing an integral role in its execution over the years—and take reasonable steps to receive no benefit from facilitating a venture committing sex trafficking victimization.

84. By all appearances, the hotels at issue, including Studio 4 Less Defendants in this case, would not survive financially without the sex-trafficking business writ large. The Studio 4 Less Defendants had actual and constructive knowledge that sex trafficking regularly occurs at their property.

85. The other Defendants benefitted from the events at the Studio & Suites 4 Less property, and either knew or should have known that they were participating in a venture connected to sex trafficking victimization through their association with the Studio 4 Less Defendants.

**c. *Days Inn by Wyndham Norfolk Military Circle***

86. L.O. was trafficked through the Days Inn by Wyndham Norfolk Military Circle from approximately 2014 through 2019. L.O., Tom Roe, Jake Roe, and the others in their group would stay at this location for approximately a week, almost every month.

87. Defendant Sun Norfolk LLC, as owner, along with Wyndham Hotels and Resorts Inc. (hereinafter, "WHRI") and Days Inn Worldwide Inc. (hereinafter "Days Inn" and collectively referred to as "Wyndham Franchisors"[6]) as franchisors and owners of the Days Inn brand, the Norfolk Military Circle Days Inn hotel, and the unnamed and unidentified employees thereof ("Days Inn Defendants") formed a business venture that participated in Tom Roe's and Jake Roe's sex trafficking scheme. The hotel employees involved in this venture include, but are not limited to, the front desk workers, housekeeping and janitorial staff, maintenance workers, owners, accounting persons, and managers. At all relevant times, the Days Inn Defendants, their agents and employees, acted within the scope of their agency or employment.

88. At all relevant times, the above-described Days Inn Defendants had a continuous or repeat relationship with Tom Roe and Jake Roe wherein they knowingly rented multiple rooms

---

[6] The use of "Wyndham Franchisors" within this Complaint refers to Wyndham Hotels and Resorts Inc., Days Inn Worldwide Inc., and Ramada Worldwide Inc.

at a time to L.O.'s traffickers to facilitate—at a minimum—a venture that they knew or should have known involved sex trafficking victimization, including L.O.'s victimization.

89. The hotel staff were familiar with Tom Roe, Jake Roe, and L.O. and had no illusions about what was happening, given how frequently and for how long they used the hotel as a base for the ongoing sex-trafficking enterprise.

90. The hotel staff monitored L.O. for Tom Roe and Jake Roe during police raids and similar investigations, causing her fear and anxiety which prevented her from escaping.

91. On one occasion, the Days Inn Defendants contacted L.O. to verify her room number and to warn her not to leave her room when the police came to raid a different hotel room.

92. At all relevant times, there were and are cameras throughout the public areas of the hotel, including its hotels.

93. The motel is laid out such that one must check-in with the front desk to rent any of the rooms, the room doors are in full view of hotel employees, as is the parking right outside those doors, giving the hotel and its employees plain view and direct knowledge of the trafficking circumstances.

94. Given their knowledge or opportunity to apprehend the situation, it was incumbent on Days Inn Defendants to take reasonable measures against providing material support, lodging, or other aid or comfort to Tom Roe and Jake Roe and their venture—instead of playing an integral role in its execution over the years—and take reasonable steps to receive no benefit from facilitating a venture committing sex trafficking victimization.

95. The other Defendants benefitted from the events at the Days Inn by Wyndham Norfolk Military Circle property, and either knew or should have known that they were

participating in a venture connected to sex trafficking victimization through their association with the Days Inn Defendants.

**d. *Ramada Limited Norfolk***

96. L.O. was trafficked through the Ramada Limited Norfolk from approximately 2014 through 2019. L.O., Tom Roe, Jake Roe, and the others in their group would stay at this location for approximately a week, almost every month, during L.O.'s trafficking ordeal.

97. Defendant LABH Inc., as owner, along with WHRI and Ramada Worldwide Inc. (hereinafter "Ramada" and collectively referred to as "Wyndham Franchisors"[7]) as franchisors and owners of the Ramada brand, the Ramada hotel, and the unnamed and unidentified employees thereof ("Ramada Defendants") formed a business venture that participated in Tom Roe's and Jake Roe's sex trafficking scheme. The hotel employees involved in this venture include, but are not limited to, the front desk workers, housekeeping and janitorial staff, maintenance workers, owners, accounting persons, and managers. At all relevant times, the above Ramada Defendants, its agents and employees, acted within the scope of their agency or employment.

98. At all relevant times, the above-described Ramada Defendants had a continuous or repeat relationship with Tom Roe and Jake Roe wherein they rented multiple rooms to L.O.'s traffickers at a time to knowingly facilitate—at a minimum—a scheme that they knew or should have known involved women, including L.O., who were coerced into participating and thus were the victims of sex trafficking.

99. On information and belief, the Ramada Defendants required the traffickers to make room reservation online.

---

[7] The use of "Wyndham Franchisors" within this Complaint shall refer to Wyndham Hotels and Resorts Inc., Days Inn Worldwide Inc., and Ramada Worldwide Inc.

100. The hotel staff were familiar with Tom Roe, Jake Roe, and L.O. and had no illusions about what was happening, given how frequently and for how long they used the hotel as a base for the ongoing sex-trafficking enterprise.

101. On one occasion, L.O. was permitted to stay in the very back of the hotel premises for 30 days. During that stay, L.O. was assaulted by a "john" in a different room near the front desk.

102. At one point, Tom Roe was upset with L.O. and used a crowbar, causing damage to the room as a means to elicit a fear response in L.O. Tom Roe's rage led to him breaking a window in L.O.'s room.

103. At all relevant times, there were and are cameras throughout the public areas of the hotel, including its hotels.

104. The motel is laid out such that one must check-in with the front desk to rent any of the rooms, the room doors are in full view of hotel employees, as is the parking right outside those doors, giving the hotel and its employees plain view and direct knowledge of the trafficking circumstances.

105. Given their knowledge or opportunity to apprehend the situation, it was incumbent on the Ramada Defendants to take reasonable measures against providing material support, lodging, or other aid or comfort to Tom Roe and Jake Roe and their venture—instead of playing an integral role in its execution over the years—and take reasonable steps to receive no benefit from facilitating a venture committing sex trafficking victimization.

106. The other Defendants benefitted from the events at the Ramada Limited Norfolk property, and either knew or should have known that they were participating in a venture connected to sex trafficking victimization through their association with the Ramada Defendants.

**e. *The Wyndham Franchisors as to all franchised properties***

107. The Days Inn by Wyndham Norfolk Military Circle and The Ramada Limited Norfolk was franchised by the Wyndham Franchisors during the time L.O. was trafficked at the location. L.O.'s trafficking frequently moved from one to the other in short succession.

108. Through the franchisor-franchisee relationship, the Wyndham Franchisors exercise substantial power to control the franchisee's business, establishing a principal-agent relationship under the Restatement (Third) of Agency, which federal courts in the Fourth Circuit rely on for federal common law agency principles.

109. As part of the franchisor/franchisee contractual relationship, the Wyndham Franchisors did and still do exercise substantial control over Defendant Sun Norfolk LLC, and Defendant LABH Inc., as their franchisee, and were and are responsible for and have the contractual right to, among other things:

a. Create and define the safety standards that franchisees (i.e., Sun Norfolk LLC and LABH Inc.,) are supposed to maintain;

b. Clearly communicate those standards to franchisees (i.e., Sun Norfolk LLC and LABH Inc.);

c. Create the materials for training franchisees (i.e., Sun Norfolk LLC and LAHB Inc.) and their employees, agents, and servants;

d. Provide some or all of the training to franchisees (i.e., Sun Norfolk LLC and LABH Inc.) or their employees, agents, and servants;

e. Enforce the standards that franchisees (i.e., Sun Norfolk LLC and LABH Inc.) are supposed to maintain;

f. Hold the franchisees (i.e., Sun Norfolk LLC and LABH Inc.) to the standards that franchisees are supposed to maintain; and

g. Terminate and replace non-compliance franchisees (i.e., Sun Norfolk and LABH).

110. Upon information and belief, the Wyndham Franchisors sent inspectors annually to grade each hotel, including Sun Norfolk and LABH. Those in-person inspections would have alerted the Wyndham Franchisors to the signs of sex trafficking identified above. Those inspectors should have known—and should have been trained to recognize—that the hotels, including Sun Norfolk and LABH, were participating in the commercial sex trade, which would have raised the likelihood of sex trafficking. These inspectors, as agents of the Wyndham Franchisors, provided constructive knowledge for the ongoing activities of the sex trafficking occurring at the franchise locations, including Sun Norfolk and LABH, but nothing changed in the sex trafficking and exploitation of L.O.

111. Because of this relationship, the Wyndham Franchisors have the right to control and in fact do control whether Sun Norfolk and LABH, or their other franchisees in Virginia and other states, take reasonable actions to prevent prostitution and sex trafficking patronage at their franchise.

112. Because of this relationship, the Wyndham Franchisors enjoy a superior vantagepoint from which to identify likely traffickers moving among its franchisees in Virginia and other states.

113. The Wyndham Franchisors' conduct, policies and practices involved in this superior vantagepoint occur, and caused harm to L.O., irrespective of the events at any particular franchised location.

114. The benefit the Wyndham Franchisors receive from sex trafficking ventures occurs irrespective of the franchised location of a particular venture's violation.

115. The Wyndham Franchisors received a financial benefit from the renting of rooms and use of facilities at their sponsored franchisee (i.e., Sun Norfolk and LABH ) locations because of royalties, rents, increased visibility and goodwill and other monies subject to the Wyndham Franchisor's contractual relationship with all of its franchisees.

116. The Wyndham Franchisors provide materials to train their franchisees, including Sun Norfolk and LABH, about the warning signs for sex trafficking within the hotel setting. Upon information and belief, the Wyndham Franchisors may exert control, either expressly or impliedly, over the hiring, control, and regulation of employees of Sun Norfolk, LABH and other franchisees.

117. The Wyndham Franchisors, upon information and belief, had a tacit agreement with Tom Roe and Jake Roe (substantially similar to the tacit agreement the Wyndham Franchisors maintained with other traffickers) to allow their sex-trafficking venture to continue profiting from the exploitation of the L.O. at the Wyndham Franchisors' franchisee locations operated by Sun Norfolk and LABH, among other locations.

118. The Wyndham Franchisors non-identification and non-action against L.O.'s sex trafficking was an act of willful blindness, or an intentional disregard of reasonable measures to outline clear expectations in franchise documents, or a manifest failure to train franchisees, including Sun Norfolk LLC and LABH Inc., to spot and respond to sex trafficking, and conduct in avoidance of ensuring that those reasonable measures were deployed.

119. Upon information and belief, the Wyndham Franchisors did nothing in view of police reports, customer complaints, or online reviews about their hotels' conditions, which would

have highlighted the fact that the hotels were host to rampant sex trade, drug abuse, and other nefarious activities.

120. Upon information and belief, the Wyndham Franchisors omitted questions regarding prostitution and sex trafficking from their franchisee review process, including when reviewing and interviewing Sun Norfolk LLC and their employees.

121. Upon information and belief, the Wyndham Franchisors conducted surveys of the hotels' guest population and activities, yet omitted surveying whether the hotel's viability depends on sex trafficking and other criminal activity. As part of any annual review, the Wyndham Franchisors would have discovered that the hotels were part of an illicit trafficking venture by comparing cash versus credit receipts, and contrasting the reported profitability versus the apparent viability of these hotels.

122. These are reasonable steps that likely would have shut down the respective hotels as havens for the sex trade and, therefore, a high likelihood of sex trafficking, but the Wyndham Franchisors did nothing. Nor did the Wyndham Franchisors disassociate themselves from hotels they knew or should have known where providing safe haven to traffickers, but rather knowingly accepted the proceeds provided for in their franchise agreements.

123. The Wyndham Franchisors operate a broad portfolio of brands and other intellectual property aimed at capturing a substantial and diversified market share of hospitality commerce. They purport to be "the world's largest hotel franchising company," and "a leading presence in the economy and midscale segments of the lodging industry" and "a leading provider of hotel management services."[8]

---

[8]https://investor.wyndhamhotels.com/news-events/press-releases/detail/126/wyndham-hotels-resorts-reinforces-efforts-to-combat-human

124. By all appearances, the subset of hotels at issue, including Sun Norfolk and LABH, would not survive financially without the sex trafficking business writ large. The Wyndham Franchisors had actual and constructive knowledge, based on the various warning signs and guidance issued by local Attorneys General, the Department of Homeland Security, and the various trade organizations and special interest groups Wyndham Franchisors have interacted with, that sex trafficking regularly occurs at precariously positioned hotels owned, operated, and controlled by the Wyndham Franchisors.

125. In view of the information available to the Wyndham Franchisors regarding the conditions and complaints involved in this subset of franchised locations, the Wyndham Defendants did not fail to correct wayward franchisees; rather, the Wyndham Defendants targeted these operators with offers to provide structure and support and goodwill on favorable terms, to ensure that Wyndham's market share stayed diversified and captured revenue from the gray areas of the hospitality industry. From the superior vantagepoint of the Wyndham Franchisors, L.O. and similarly situated persons were acceptable collateral damage in their pursuit of profit and market dominance.

126. The Wyndham Franchisors participated in the "ventures" involving several hotels—whether by owning, operating, or providing the training and supervision to franchisees and receiving the aggregate information created by the traffickers' activity at every franchise location. The information generated by the franchise ventures including the ventures with Sun Norfolk LLC and LABH Inc., thereby provided actual and constructive knowledge of violative activities, including Tom Roe's and Jake Roe's sex trafficking of L.O. at Sun Norfolk LLC and LABH Inc., at franchisee locations.

127. Upon information and belief, Wyndham Franchisors are and were aware that their hotels, including Sun Norfolk and LABH, are havens for the sex industry.

128. The industry group, the American Hotel & Lodging Associate (www.ahla.com), implemented a national anti-trafficking campaign called "No Room for Trafficking." This was highlighted by Wyndham Franchisors several years ago, when they adopted more robust standards.[9]

129. The Wyndham Franchisors have acknowledged their failures to combat sex trafficking and have attempted to demonstrate what the Wyndham Franchisors will start doing to combat it more effectively.

130. The Wyndham Franchisors have each published statements about their commitments to establishing compliance standards and efforts to combat sex trafficking through their hotels.[10]

131. Despite the Wyndham Franchisors' publicized stance and knowledge of sex trafficking at their franchised locations, the Wyndham Franchisors' permitted Tom Roe and Jake Roe to continually force, abuse, and exploit women, including L.O., to allow the venture to continue so that the Wyndham Franchisors could continue to profit.

132. From its superior vantagepoint, informed by its connections, Wyndham Franchisors had the means to identify L.O. as a trafficking victim and her traffickers as persons to be denied service at all Wyndham franchised locations. The trafficking venture would have been devastated had the self-proclaimed "world's largest hotel franchising company," and "leading presence in the economy and midscale segments of the lodging industry" ordered its franchised locations to deny

---

[9] https://investor.wyndhamhotels.com/news-events/press-releases/detail/126/wyndham-hotels-resorts-reinforces-efforts-to-combat-human

[10] https://investor.wyndhamhotels.com/news-events/press-releases/detail/126/wyndham-hotels-resorts-reinforces-efforts-to-combat-human.

service to these notorious sex traffickers. Instead, Wyndham Franchisors chose to withhold from its franchisees the fruits of a superior vantagepoint.

133. The Wyndham Franchisors have known about the red flags of sex trafficking and acknowledged that they have the responsibility, opportunity, means, and capability of doing something about it. They deliberately arranged their franchisor-franchisee relationships to enjoy a superior vantagepoint. They targeted a subset of hotels likely to rely on commercial sex trade for revenue. And they acquiesced to the traffickers continuing their venture among Wyndham properties. Although each Defendant benefitted from L.O.'s sex trafficking, and certain John Does employed and/or authorized by and/or associated with the Defendants perpetrated L.O.'s sex trafficking, the Wyndham Franchisors played a central role in the trafficking of innumerable similarly situated victims across thousands of properties.

134. Given their knowledge or opportunity to apprehend the situation, it was incumbent on the Wyndham Defendants to take reasonable measures against providing material support, lodging, or other aid or comfort to Tom Roe and Jake Roe and their venture—instead of playing an integral role in its execution over the years—and take reasonable steps to receive no benefit from facilitating a venture committing sex trafficking victimization.

135. The other Defendants benefitted from the conduct, the practices and policies at Wyndham Franchisor property, and either knew or should have known that they were participating in a venture connected to sex trafficking victimization through their association with Wyndham Franchisors.

**f.** ***Motel 6 Norfolk***

136. L.O. was trafficked through the Motel 6 Norfolk from approximately 2014 through 2019. L.O., Tom Roe, Jake Roe, and the others in their group would stay at this location for approximately a week, almost every month, during L.O.'s trafficking ordeal.

137. Upon information and belief, during the times L.O. was trafficked, Defendants G6 Property and/or Motel 6 Operating L.P., owned, operated, maintained or controlled the Motel 6 Norfolk ("Motel 6 Defendants"), and was franchised by Defendants, G6 Hospitality LLC, Motel 6 Operating L.P., and/or G6 Hospitality Properties LLC (the "G6 Franchisors") or one of their affiliates.

138. Defendants G6 Hospitality Property LLC and/or Motel 6 Operating L.P., along with the G6 Franchisors as franchisors and owners of the Motel 6 brand, the Motel 6 Norfolk hotel, and the unnamed and unidentified employees thereof (hereinafter collectively referred to "G6 Defendants"), formed a business venture that participated in Tom Roe's and Jake Roe's sex trafficking scheme. The hotel employees involved in this venture include, but are not limited to, the front desk workers, housekeeping and janitorial staff, maintenance workers, owners, accounting persons, and managers. At all relevant times, the G6 Defendants, its agents and employees, acted within the scope of their agency or employment.

139. At all relevant times, the above-described Motel 6 Defendants had a continuous or repeat relationship with Tom Roe and Jake Roe wherein they rented multiple rooms to L.O.'s traffickers at a time to knowingly facilitate—at a minimum—a scheme that they knew or should have known involved women, including L.O., who were coerced into participating and thus were the victims of sex trafficking.

140. The hotel staff were familiar with Tom Roe, Jake Roe, and L.O. and had no illusions about what was happening, given how frequently and for how long they used the hotel as a base for the ongoing sex-trafficking enterprise.

141. On information and belief, L.O.'s traffickers were required to pay for rooms online.

142. The Motel 6 staff kept L.O. in the back building. At one point, they allowed her to use the handicap accessible room.

143. At the Motel 6, L.O. was drugged and gang raped while Tom Roe watched.

144. On information and belief, during a different stay at the Motel 6, L.O. met the owner of the Econo Lodge.

145. At all relevant times, there were and are cameras throughout the public areas of the hotel, including its hotels.

146. The motel is laid out such that one must check-in with the front desk to rent any of the rooms, the room doors are in full view of hotel employees, as is the parking right outside those doors, giving the hotel and its employees plain view and direct knowledge of the trafficking circumstances.

147. Through the franchisor-franchisee relationship, the G6 Franchisors exercise substantial power to control the franchisee's actions, establishing a principal-agent relationship under the Restatement (Third) of Agency, which federal courts in the Fourth Circuit rely on for federal common law agency principles.

148. As part of the franchisor/franchisee contractual relationship, the G6 Franchisors did and still do exercise substantial control over Motel 6 Defendants, and were and are responsible for and have the contractual right to, among other things:

a. The G6 Franchisors have the right to prescribe what the franchisees shall and shall not do, in both specific and general terms;

b. For example, the G6 Franchisors instruct that franchisees must operate their motels in *strict conformance* with the G6 Franchisors' standards, which contain (among other things) mandatory standards and procedures for operating motels;

c. The G6 Franchisors require franchisees to arrange for and pay for specific types and levels of insurance coverage;

d. The G6 Franchisors require franchisees to pay for and utilize specific software support maintenance, and updates for central reservations, help desk services, and their property management systems;

e. The G6 Franchisors dictate that franchisees and their managing owner or executive must attend their annual conference;

f. If the franchisee's manager is replaced, the new manager must complete manager training at the G6 Franchisor's headquarters or virtually within two months of being hired;

g. Franchisees must use the G6 Franchisors' automated attendant program to route phone calls made to the franchisee's motel;

h. Franchisees must provide guest WIFI access in accordance with Motel 6 Standards;

i. Franchisees must provide mandatory television channels and services, including HBO;

j. Franchisees must purchase certain specific supplies (such as hardware and software for computer systems, bedspreads, drapes, signage, etc.) from the G6 Franchisors and approved suppliers;

k. The G6 Franchisors create and define the safety standards that franchisees (i.e., G6 Hospitality Property LLC and/or Motel 6 Operating L.P.) are supposed to maintain;

l. The G6 Franchisors clearly communicate those standards to franchisees (i.e., G6 Hospitality Property LLC and/or Motel 6 Operating L.P.);

m. The G6 Franchisors create the materials for training franchisees (i.e., G6 Hospitality Property LLC and/or Motel 6 Operating L.P.) and their employees, agents, and servants;

n. The G6 Franchisors provide some or all of the training to franchisees (i.e., G6 Hospitality Property LLC and/or Motel 6 Operating L.P.) or their employees, agents, and servants;

o. The G6 Franchisors enforce the standards that franchisees (i.e., G6 Hospitality Property LLC and/or Motel 6 Operating L.P.) are supposed to maintain;

p. The G6 Franchisors hold the franchisees (i.e., G6 Hospitality Property LLC and/or Motel 6 Operating L.P.) to the standards that franchisees are supposed to maintain;

q. Even after the franchise agreement establishes the contractual relationship, the G6 Franchisors have the right to provide interim instructions or directions to their franchisees;

r. For example, the G6 Franchisors may from time to time require franchisees or their employees to attend training programs;

s. If the franchisee fails to adequately resolve a guest complaint or a response to a guest satisfaction survey, then the G6 Franchisors may exercise their discretion to intervene, in which case the franchisee must reimburse the G6 Franchisors for any expenses and for any compensation paid to the guest;

t. The G6 Franchisors may require periodic renovation under a property improvement plan ("PIP"), and the G6 Franchisors may charge the franchisee a fee for preparing the PIP;

u. The G6 Franchisors may change the mandatory television channels and services that must be provided from time to time;

v. At their sole discretion, G6 Franchisors may mark up products that the franchisees must purchase through the G6 Hospitality e-procurement market place to meet standards and specifications to cover incremental expenses and overhead or to fund conventions; and

w. At their sole discretion, G6 Franchisors terminate and replace non-compliance franchisees (i.e., G6 Hospitality Property LLC and/or Motel 6 Operating L.P.).

149. Because of this relationship, the G6 Franchisors have the right to control and in fact do control whether G6 Hospitality Property LLC and/or Motel 6 Operating L.P. or their other franchisees, take reasonable actions to prevent prostitution and sex trafficking patronage at their franchise.

150. Upon information and belief, the G6 Franchisors sent inspectors annually to grade each hotel, including G6 Hospitality Property LLC and/or Motel 6 Operating L.P. Those in-person inspections would have alerted the G6 Franchisors to the signs of sex trafficking identified above at all relevant times. Those inspectors should have known—and should have been trained to recognize—that the hotels, including G6 Hospitality Property LLC and/or Motel 6 Operating L.P., were aiding and abetting sex trade businesses, which would have raised the likelihood of sex trafficking. These inspectors, who acted as agents of the G6 Franchisors, provided constructive knowledge for the ongoing activities of the sex trafficking occurring at the franchise locations, including G6 Hospitality Property LLC and/or Motel 6 Operating L.P., but since nothing changed in the sex trafficking and exploitation of L.O., the G6 Franchisors acquiesced to their continued participation in a venture with Tom Roe and Jake Roe.

151. Because of this relationship, the G6 Franchisors enjoy a superior vantagepoint from which to identify likely traffickers moving among its franchisees in Virginia and other states.

152. The G6 Franchisors' conduct, policies and practices involved in this superior vantagepoint occur irrespective of the events at any particular franchised location.

153. The benefit the G6 Franchisors receive from sex trafficking ventures occurs irrespective of the franchised location of a venture's violation.

154. The G6 Franchisors received a financial benefit from the renting of rooms and use of facilities at their sponsored franchisees (i.e., G6 Hospitality Property LLC and/or Motel 6 Operating L.P.) locations because of royalties, rents, increased visibility and goodwill and other monies subject to the G6 Franchisor's contractual relationship with G6 Hospitality Property LLC and/or Motel 6 Operating L.P. or other franchisees.

155. The G6 Franchisors provide materials to train their franchisees, including G6 Hospitality Property LLC and/or Motel 6 Operating L.P., about the warning signs for sex trafficking within the hotels and, upon information and belief, have control, either expressly or implied, over the hiring, control, and regulation of employees of G6 Hospitality Property LLC and/or Motel 6 Operating L.P., and other franchisees.

156. The G6 Franchisors, upon information and belief, had a tacit agreement with Tom Roe and Jake Roe to allow their sex-trafficking venture to continue profiting from the exploitation of the L.O. by her traffickers at the G6 Franchisors' franchisee locations, including G6 Hospitality Property LLC and/or Motel 6 Operating L.P.

157. The G6 Franchisors non-identification and non-action against L.O.'s sex trafficking was an act of willful blindness, or an intentional disregard of reasonable measures to outline clear expectations in franchise documents, or a manifest failure to train franchisees, including Motel 6 Defendants, to spot and respond to sex trafficking, and subsequent conduct in avoidance of ensuring that those reasonable measures were deployed.

158. Upon information and belief, the G6 Franchisors ignored police reports and online reviews about their hotels' conditions which would have highlighted the fact that the hotels were home to rampant prostitution.

159. The G6 Franchisors also should have been aware of the public postings and reviews that described the rampant sex trade at the G6 Franchisors' hotels, including G6 Hospitality Property LLC's and/or Motel 6 Operating L.P.'s location, to which their names are associated.

160. Upon information and belief, the G6 Franchisors omitted questions regarding prostitution and sex trafficking from their franchisee review process, including G6 Hospitality Property LLC and/or Motel 6 Operating L.P. and their employees,

161. Upon information and belief, the G6 Franchisors conducted surveys of the hotels' guest population and activities, yet omitted surveying whether the hotel's viability depends on sex trafficking and other criminal activity. As part of any annual review, the Wyndham Franchisors would have discovered that the hotels were part of an illicit trafficking venture by comparing cash versus credit receipts, and contrasting the reported profitability versus the apparent viability of these hotels.

162. These are reasonable steps that likely would have shut down the respective hotels as havens for the sex trade and, therefore, a high likelihood of sex trafficking, but the G6 Franchisors did nothing. Nor did the G6 Franchisors disassociate themselves from hotels they knew or should have known where providing safe haven to traffickers, but rather knowingly accepted the proceeds provided for in their franchise agreements.

163. Upon information and belief, G6 Franchisors are and were aware that their hotels, including G6 Hospitality Property LLC and/or Motel 6 Operating L.P., which tend to be lower cost and frequently located in low-income areas, are havens for the sex industry.[11]

164. By all appearances, the subset of hotels at issue, including Motel 6 Norfolk, would not survive financially without the sex trafficking business writ large. The G6 Franchisors had actual and constructive knowledge, based on the various warning signs and guidance issued by local Attorneys General, the Department of Homeland Security, and the various trade organizations and special interest groups G6 Franchisors have interacted with, that sex trafficking regularly occurs at precariously positioned hotels owned, operated, and controlled by the G6 Franchisors.

165. In view of the information available to the G6 Franchisors regarding the conditions and complaints involved in this subset of franchised locations, the G6 Franchisors did not fail to

[11] https://www.cbsnews.com/news/motel-6-pays-250000-to-settle-human-trafficking-suit/

correct wayward franchisees; rather, the G6 Franchisors targeted these operators, including the Motel 6 Defendants, with offers to provide structure and support and goodwill on favorable terms, to ensure that G6 Franchisors' market share stayed diversified and captured revenue from the gray areas of the hospitality industry. From the superior vantagepoint of the G6 Franchisors, L.O. and similarly situated persons were acceptable collateral damage in their pursuit of profit and market dominance.

166. The G6 Franchisors participated in the "ventures" involving several hotels—whether by owning, operating, or providing the training and supervision to franchisees and receiving the aggregate information created by the traffickers' activity at every franchise location. The information generated by the franchise ventures including the ventures with G6 Hospitality Property LLC and/or Motel 6 Operating L.P., provided actual and constructive knowledge of violative activities, including Tom Roe's and Jake Roe's sex trafficking of L.O. at the Motel 6 Norfolk operated by G6 Hospitality Property LLC and/or Motel 6 Operating L.P., among other franchisee locations.

167. The industry group, the American Hotel & Lodging Associate (www.ahla.com), implemented a national anti-trafficking campaign called "No Room for Trafficking." This was highlighted by G6 Franchisors several years ago, when they adopted more robust standards.[12]

168. The G6 Franchisors have acknowledged their failures to combat sex trafficking and have attempted to demonstrate what the G6 Franchisors will start doing to combat it more effectively.

---

[12] https://g6hospitality.com/motel-6-expands-human-trafficking-awareness-and-prevention-efforts-through-partnerships-with-truckers-against-trafficking-and-new-friends-new-life/.

169. The G6 Franchisors have each published their compliance standards and efforts to combat sex trafficking through their hotels.[13]

170. Despite the G6 Franchisors' publicized stance and knowledge of sex trafficking at their franchised locations, the G6 Defendants permitted Tom Roe and Jake Roe to continually force, abuse, and exploit women, including L.O., to allow the venture to continue so that the G6 Defendants could continue to profit.

171. The G6 Franchisors have known about the red flags of sex trafficking and acknowledged that they have the responsibility, opportunity, means, and capability of doing something about it. They deliberately arranged their franchisor-franchisee relationships to enjoy a superior vantagepoint. They targeted a subset of hotels likely to rely on commercial sex trade for revenue. And they acquiesced to the traffickers continuing their venture among G6 properties. Although each Defendant benefitted from L.O.'s sex trafficking, and certain John Does employed and/or authorized by and/or associated with the Defendants participated in L.O.'s sex trafficking, the G6 Franchisors played a central role in the trafficking of innumerable similarly situated victims across thousands of properties.

172. Given their knowledge or opportunity to apprehend the situation, it was incumbent on G6 Defendants to take reasonable measures against providing material support, lodging, or other aid or comfort to Tom Roe and Jake Roe and their venture—instead of playing an integral role in its execution over the years—and take reasonable steps to receive no benefit from facilitating a venture committing sex trafficking victimization.

---

[13] https://g6hospitality.com/about-us/combating-human-trafficking/

173. The other Defendants benefitted from the events at the Motel 6 property, and either knew or should have known that they were participating in a venture connected to sex trafficking victimization through their association with the Ramada Defendants.

**g. *Econo Lodge Airport***

174. L.O. was trafficked through the Econo Lodge Airport from approximately 2014 through 2019. L.O., Tom Roe, Jake Roe, and the others in their group would stay at this location for approximately a week, almost every month, during L.O.'s trafficking ordeal.

175. Defendant Liam LLC, as owner, along with Choice Hotels International Inc. (hereinafter referred to as "Choice Franchisors") as franchisors and owners of the Econo Lodge brand, the Econo Lodge hotel, and the unnamed and unidentified employees thereof ("Econo Defendants") formed a business venture that participated in Tom Roe's and Jake Roe's sex trafficking scheme. The hotel employees involved in this venture include, but are not limited to, the front desk workers, housekeeping and janitorial staff, maintenance workers, owners, accounting persons, and managers. At all relevant times, the Econo Defendants, its agents and employees, acted within the scope of their agency or employment.

176. At all relevant times, the above-described Econo Defendants had a continuous or repeat relationship with Tom Roe and Jake Roe wherein they rented multiple rooms to L.O.'s traffickers at a time to knowingly facilitate—at a minimum—a scheme that they knew or should have known involved women, including L.O., who were coerced into participating and thus were the victims of sex trafficking.

177. At all relevant times, there were and are cameras throughout the public areas of the hotel, including its hotels.

178. The motel is laid out such that one must check-in with the front desk to rent any of the rooms, the room doors are in full view of hotel employees, as is the parking right outside those doors, giving the hotel and its employees plain view and direct knowledge of the trafficking circumstances.

179. The hotel staff were familiar with Tom Roe, Jake Roe, and L.O. and had no illusions about what was happening, given how frequently and for how long they used the hotel as a base for the ongoing sex-trafficking enterprise.

180. The Econo Defendants frequently rented a block of rooms to L.O.'s traffickers.

181. On one occasion, during a police sting operation in the section of the hotel where she was frequently placed, L.O. was instructed not to answer her phone.

182. Through the franchisor-franchisee relationship, the Choice Franchisors exercise substantial power to control the franchisee's actions, establishing a principal-agent relationship under the Restatement (Third) of Agency, which federal courts in the Fourth Circuit rely on for federal common law agency principles.

183. As part of the franchisor/franchisee contractual relationship, the Choice Franchisors did and still do exercise substantial control over Defendant Liam LLC, as their franchisee, and were and are responsible for and have the contractual right to, among other things:

a. Create and define the safety standards that franchisees (i.e., Liam LLC) are supposed to maintain;

b. Clearly communicate those standards to franchisees (i.e., Liam LLC);

c. Create the materials for training franchisees (i.e., Liam LLC) and their employees, agents, and servants;

d. Provide some or all of the training to franchisees (i.e., Liam LLC) or their employees, agents, and servants;

e. Enforce the standards that franchisees (i.e., Liam LLC) are supposed to maintain;

f. Hold the franchisees (i.e., Liam LLC) to the standards that franchisees are supposed to maintain; and

g. Terminate and replace non-compliance franchisees (i.e., Liam LLC).

184. Upon information and belief, the Choice Franchisors sent inspectors annually to grade each hotel, including Liam LLC. Those in-person inspections would have alerted the Choice Franchisors to the signs of sex trafficking identified above at all relevant times. Those inspectors should have known—and should have been trained to recognize—that the hotels, including Liam LLC, were aiding and abetting sex trade businesses, which would have raised the likelihood of sex trafficking. These inspectors, who acted as agents of the Choice Franchisors, provided constructive knowledge for the ongoing activities of the sex trafficking occurring at the franchise locations, including Liam LLC, but since nothing changed in the sex trafficking and exploitation of L.O., the Choice Franchisors acquiesced to their continued participation in a venture with Tom Roe and Jake Roe.

185. Because of this relationship, the Choice Franchisors have the right to control and in fact do control whether Liam LLC or their other franchisees take reasonable actions to prevent prostitution and sex trafficking patronage at their franchises.

186. Because of this relationship, the Choice Franchisors enjoy a superior vantagepoint from which to identify likely traffickers moving among its franchisees in Virginia and other states.

187. The Choice Franchisors' conduct, policies and practices involved in this superior vantagepoint occur irrespective of the events at any particular franchised location.

188. The benefit the Choice Franchisors receive from sex trafficking ventures occurs irrespective of the franchised location of a venture's violation.

189. The Choice Franchisors received a financial benefit from the renting of rooms and use of facilities at their sponsored franchisee (i.e., Liam LLC) locations because of royalties, rents, increased visibility and goodwill and other monies subject to the Choice Franchisor's contractual relationship with Liam LLC or other franchisees.

190. The Choice Franchisors provide materials to train their franchisees, including Liam LLC, about the warning signs for sex trafficking within the hotels and, upon information and belief, have control, either expressly or implied, over the hiring, control, and regulation of employees of Liam LLC, and other franchisees.

191. The Choice Franchisors, upon information and belief, had a tacit agreement with Tom Roe and Jake Roe to allow their sex-trafficking venture to continue profiting from the exploitation of the L.O. by her traffickers at the Choice Franchisors' franchisee locations, including Liam LLC.

192. The Choice Franchisors non-identification and non-action against L.O.'s sex trafficking was an act of willful blindness, or an intentional disregard of reasonable measures to outline clear expectations in franchise documents, or a manifest failure to train franchisees, including Liam LLC, to spot and respond to sex trafficking, and subsequent avoidance to ensure that those reasonable measures are deployed.

193. Upon information and belief, the Choice Franchisors did nothing in view of police reports, customer complaints, or online reviews about their hotels' conditions, which would have

highlighted the fact that the hotels were home to rampant sex trade, drug abuse, and other nefarious activities.

194. Upon information and belief, the Choice Franchisors omitted questions regarding prostitution and sex trafficking from their franchisee review process, including when reviewing and interviewing Liam LLC and their employees.

195. Upon information and belief, the Choice Franchisors conducted surveys of the hotels' guest population and activities, yet omitted surveying whether the hotel's viability depends on sex trafficking and other criminal activity. As part of any annual review, the Choice Franchisors would have discovered that the hotels were part of an illicit trafficking venture by comparing cash versus credit receipts, and contrasting the reported profitability versus the apparent viability of these hotels.

196. These are reasonable steps that likely would have shut down the respective hotels as havens for the sex trade and, therefore, a high likelihood of sex trafficking, but the Choice Franchisors did nothing. Nor did the Choice Franchisors disassociate themselves from hotels they knew or should have known where providing safe haven to traffickers, but rather knowingly accepted the proceeds provided for in their franchise agreements.

197. In view of the information available to the Choice Franchisors regarding the conditions and complaints involved in this subset of franchised locations, the Choice Franchisors did not fail to correct wayward franchisees; rather, the Choice Franchisors targeted these operators, including the Econo Lodge franchisee, Liam LLC, with offers to provide structure and support and goodwill on favorable terms, to ensure that Choice Franchisors' market share stayed diversified and captured revenue from the gray areas of the hospitality industry. From the superior

vantagepoint of the Choice Franchisors, L.O. and similarly situated persons were acceptable collateral damage in their pursuit of profit and market dominance.

198. The Choice Franchisors participated in the "ventures" involving several hotels—whether by owning, operating, or providing the training and supervision to franchisees and receiving the aggregate information created by the traffickers' activity at every franchise location. The information generated by the franchise ventures including the ventures with Liam LLC, thereby provided actual and constructive knowledge of violative activities, including Tom Roe's and Jake Roe's sex trafficking of L.O. at Liam LLC's property, at franchisee locations.

199. Upon information and belief, Choice Franchisors are and were aware that their hotels, including Liam LLC, which tend to be lower cost and frequently located in low-income areas, are havens for the sex industry.

200. The industry group, the American Hotel & Lodging Associate (www.ahla.com), implemented a national anti-trafficking campaign called "No Room for Trafficking." This was highlighted by Choice Franchisors several years ago, when they adopted more robust standards.[14]

201. The Choice Franchisors have acknowledged their failures to combat sex trafficking and have attempted to demonstrate what the Choice Franchisors will start doing to combat it more effectively.

202. The Choice Franchisors have each published their compliance standards and efforts to combat sex trafficking through their hotels.[15]

203. However, it still does not appear that the Choice Franchisors did anything to prevent L.O. from being trafficked at its franchised locations, including Liam LLC, as the Choice

[14] https://media.choicehotels.com/2024-04-25-Choice-Hotels-International-Unveils-Year-of-Sustainability-Milestones-in-Newly-Published-2023-Environmental,-Social,-and-Governance-Report
[15] https://media.choicehotels.com/2024-04-25-Choice-Hotels-International-Unveils-Year-of-Sustainability-Milestones-in-Newly-Published-2023-Environmental,-Social,-and-Governance-Report

Franchisors' direct involvement, or at the very least their willful blindness, permitted the venture to continue so they could continue benefiting financially from Tom Roe's and Jake Roe's actions.

204. The Choice Franchisors permitted Tom Roe and Jake Roe to continually force, abuse, and exploit women, including L.O., to allow the venture to continue so that the Choice Franchisors could continue to profit.

205. The Choice Franchisors' participation in the venture, despite the Choice Franchisors' publicized stance and knowledge of sex trafficking at their franchised locations, including Liam LLC, allowed L.O., and other trafficked individuals, to be injured emotionally, mentally, and physically during their ordeal at the Choice Franchisors' premises.

206. The Choice Franchisors have thus known about these red flags of sex trafficking and now acknowledge that they have the responsibility, opportunity, means, and capability of doing something about it. They deliberately arranged their franchisor-franchisee relationships to enjoy a superior vantagepoint. They targeted a subset of hotels likely to rely on the commercial sex trade for revenue. And they acquiesced to the traffickers continuing their venture among Choice-franchised properties. Although each Defendant benefitted from L.O.'s sex trafficking, and certain John Does employed and/or authorized by and/or associated with the Defendants participated in L.O.'s sex trafficking, the Choice Franchisors played a central role in the trafficking of innumerable similarly situated victims across thousands of properties.

207. By all appearances, the hotels at issue, including Liam LLC, in this case would not survive financially without the sex trafficking business writ large. The Choice Franchisors had actual and constructive knowledge, based on the various warning signs issued by local Attorneys General, as well as by the Department of Homeland Security, that sex trafficking regularly occurs at hotels owned, operated, and controlled by the Choice Franchisors.

208. The Choice Franchisors also should have been aware of the public postings and reviews that described the rampant sex trade at the Choice Franchisors' hotels, including Liam LLC's location, to which their names are associated.

209. Given their knowledge or opportunity to apprehend the situation, it was incumbent on the Choice Franchisors to take reasonable measures against providing material support, lodging, or other aid or comfort to Tom Roe and Jake Roe and their venture—instead of playing an integral role in its execution over the years—and take reasonable steps to receive no benefit from facilitating a venture committing sex trafficking victimization.

210. The other Defendants benefitted from the events at the Econo Lodge property, and either knew or should have known that they were participating in a venture connected to sex trafficking victimization through their association with the Econo Lodge Defendants.

## II. CAUSES OF ACTION

211. All conditions precedent have been satisfied.

### A. Count One: Civil Remedy for Violation of Federal Anti-Trafficking Statute (18 U.S.C. § 1581 *et seq*.) (Against all Defendants)

212. L.O. realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as fully set forth herein.

213. L.O. is a victim of a severe form of trafficking and was caused to engage in commercial sex acts by force, fraud, and coercion. 22 U.S.C. § 7102(11); 18 U.S.C. § 1591(a).

214. L.O. is entitled to a civil remedy under 18 U.S.C. § 1595(a) as to all Defendants, for compensatory damages, punitive damages, attorneys' fees, and costs.

215. Defendants have each (and among them jointly and severally) violated the *Victims of Trafficking and Violence Protection Reauthorization Act*, 18 U.S.C. § 1581 *et seq.* ("TVPRA"), and therefore, are liable to L.O. as perpetrators of her trafficking.

216. Tom Roe and Jake Roe would not have been able to carry out their scheme to traffic L.O. without the participation of Defendants. Therefore, each Defendant, both jointly and severally, is liable as perpetrators under 18 U.S.C. § 1595 of the TVPRA.

217. Alternatively, Defendants are liable to L.O. as beneficiaries of her trafficking, having knowingly benefited, or attempted or conspired to benefit, either financially or by receiving anything of value, from participating in a venture which they knew or should have known has engaged in an act in violation of the TVPRA.

218. Defendants, through their officers and employees and agents, participated in the venture of L.O.'s traffickers in at least the following ways:

a. Providing rooms to harbor L.O., other victims, and her traffickers under conditions at variance with arms-length transactions. As alleged in this Complaint, L.O.'s traffickers were not held to the same standards of occupancy as regular guests.

b. Providing warnings to the venture about law enforcement activity.

c. Providing internet services to facilitate the venture's itinerancy and profitability.

d. Taking steps to avoid learning of illegal conduct occurring on their premises.

e. Taking steps to avoid identifying victims and associates of the venture.

f. Omitting or overlooking the inclusion of reasonable acts of due diligence from employee job performance, inspector punch lists, auditing protocols, and contractual obligations.

g. Maintaining silence regarding the venture amongst each other.

219. Defendants knew or should have known about, at minimum, the violative acts alleged in this Complaint through direct observance, indirect apprehension, or collegiality. Defendants had a duty to use due diligence or a reason to know the same. Each Defendant knew or should have known that L.O. or a similarly situated individual was being trafficked as part of the venture.

220. Defendants knowingly benefitted from the venture of L.O.'s traffickers by accepting money from L.O.'s traffickers and other trafficking associates and commercial sex patrons, perceiving Defendants as reliable hosts for their designs.

221. Defendants knowingly benefitted from the steady stream of income, including royalties paid by the franchisees to their respective franchisors, generated by the venture of L.O.'s traffickers, and others; and realized an asset value greater than would be realized without commercial sex patronage, including the franchisor's brand-projection, goodwill, market share capture, and the appreciation in the value of the franchisors' name.

222. Alternatively, Defendants attempted or conspired to benefit from the venture of L.O.'s traffickers.

223. In addition to the venture of L.O.'s traffickers, each Defendant is liable as a perpetrator or beneficiary of the five hotel ventures, discretely and in concert as a ring that hedged the risk involved in extracting money from commercial sex, including L.O.'s trafficking.

224. The five hotel ventures would not have been able to carry out their scheme to profit from commercial sex, including L.O.'s trafficking, without the participation of each Defendant. Therefore, the Defendants are jointly and severally liable under 18 U.S.C. § 1595 of the TVPRA as perpetrators.

225. Alternatively, the Defendants are liable to L.O. as beneficiaries of her trafficking, having knowingly benefited, or attempted or conspired to benefit, either financially or by receiving anything of value, from participating in the five hotel ventures which they knew or should have known has engaged in an act in violation of the TVPRA.

226. Defendants participated in these hotel ventures by forming contracts, among themselves and with third-parties necessary to operate hotels and franchises, and by informal associations with one another outside any contractual undertaking existing concurrently.

227. Defendants knew or should have known of the violative acts alleged by L.O., and that their formal and informal participation in the five hotel ventures was conducted in furtherance of a movable venue for the sex trade on Highway 13 in Hampton Roads.

228. Defendants knowingly benefited from the five hotel ventures in at least the following ways:

a. Each Defendant hotel venture accepted money from L.O.'s traffickers;

b. Each Defendant accepted overall the business model for harboring sex trafficking victims and dispersing the risk among themselves;

c. Each Defendant hotel venture was able to rely on a constant stream of income not just from Tom Roe's and Jake Roe's trafficking of L.O. and others and their room rentals, but from the knock-on effect of other traffickers perceiving the Defendants as being reliable associates;

d. Each Defendant hotel venture benefited financially from realizing the benefit of their hotel asset being more valuable on a financial basis due to the income that was generated; and

e. Each of the Defendants, including the Wyndham Franchisors, G6 Franchisors, and G6 Franchisors, benefited financially from the royalties that were paid as part of the above-noted financial benefits to the hotels themselves, and nonmonetary value generated, including the appreciation in the value of the franchisors' name and goodwill, data capture, and the fact that the brand was being projected to the public through signage and other advertisements.

229. Each franchisor knowingly targeted its franchisee to obtain something of value in capturing a portion of the market share of precariously positioned hotels and motels, in addition to royalties. In exchange for their franchisee's loyalty and royalties, the franchisors turned a blind eye to obvious indicators that these properties relied on commercial sex patronage for their survival, a dispensation not provided for in the ordinary, arms-length franchise relationship.

230. Each franchisor desired that its franchise would succeed in profiting from commercial sex patronage.

231. Each hotel venture knew or should have known that L.O. or a similarly situated individual was being trafficked as part of the venture.

232. L.O. is entitled to the damages she has suffered, including, but not limited to, pain and suffering, social stigma, mental anguish, disfigurement, loss of enjoyment of life and other hedonic damages; pecuniary losses such as her lost earnings and lost earning capacity due to the years of sex trafficking and recovery; necessary future expenses to re-establish L.O. in society and recover a normal life despite the fear, stigma, shame, scars from abuse, and mental anguish from being a sex-trafficking victim.

233. L.O. is further entitled to attorneys' fees and costs for bringing this claim, as well as punitive damages and restitution.

### B. <u>Count Two: Violation of Promotion or Facilitation of Sex Trafficking Statute (18 U.S.C. § 2421A *et seq*.) (Against all Defendants)</u>

234. L.O. realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as fully set forth herein.

235. Defendants have each (and among them jointly and severally) violated the federal statute for promoting or facilitating prostitution and the recklessly disregard sex trafficking of victims, 18 U.S.C. § 2421A *et seq.*, and therefore, are liable to L.O. for compensatory damages, punitive damages, and attorneys' fees and costs.

236. 18 U.S.C. § 2421A(b) make it a violation of federal law for one to use an interactive computer service (or attempts to do so) "with the intent to promote or facilitate the prostitution of another person" and acts in reckless disregard that such conduct contributed to sex trafficking.

237. 18 U.S.C. § 2421A(c) authorizes a civil action separately from § 1595 for damages and attorneys' fees for any person injured by reason of a violation of § 2421A(b), and subsection (d) requires the imposition of mandatory restitution.

238. Section 230 of the Communications Decency Act provides no defense to an action under 18 U.S.C. § 2421A(b) and (c).

239. Each of the defendant hotel ventures knowingly benefited financially and knew or should have known that L.O. was being trafficked for the purpose of having sex for money. They knew or should have known that even as an adult, she was not doing so of her free will and free from coercion—and their failure to know was the result of their own recklessness or willful blindness. Notwithstanding the Defendants' knowledge of L.O.'s involuntary sexual servitude, to

the extent they intended to provide interactive computer service to promote or facilitate voluntary prostitution, such intent is no defense.

240. Each Defendant benefited financially in at least the following ways:

a. Each Defendant hotel venture made money not only from L.O. but from the business model overall by harboring sex-trafficking victims;

b. Each Defendant hotel venture was able to rely on a constant stream of income not just from Tom Roe's and Jake Roe's trafficking of L.O. and others and their room rentals, but from the halo effect of others being a reliable source of income;

c. Each Defendant hotel venture benefited financially from realizing the benefit of their hotel asset being more valuable on a financial basis due to the income that was generated; and

d. Each of the Defendants, including the Wyndham Franchisors, G6 Franchisors, and Choice Franchisors, benefited financially from the royalties that were paid as part of the above-noted financial benefits to the hotels themselves, including the appreciation in the value of the Franchisors' name and good will, and the fact that the brand was being projected to the public through signage and other advertisements.

241. Tom Roe and Jake Roe would not have been able to carry out their trafficking scheme of L.O. without the participation of Defendants. Therefore, each Defendant is liable under 18 U.S.C. § 2421A *et seq.*

242. Each Defendant hotel venture was using a facility or means of interstate commerce, such as interstate wire communications via the internet and banking systems, and so owned,

managed, or operated an interactive computer service for all facets of its business, including performing banking, reservations, customer satisfaction surveys, customer reviews, video surveillance, and communications with guests and non-guests.

243. Each Defendant hotel venture promoted or intentionally facilitated prostitution in its hotels, booking rooms, and accepting payment for them year in and year out, with full knowledge that such prostitution was occurring and did nothing to stop it or curb it, and if they were actually unaware that their actions contributed to the trafficking of L.O., then they were reckless in their lack of awareness or willfully blind to a high probability that their actions contributed to the trafficking of L.O..

244. L.O. is entitled to the damages she has suffered, including, but not limited to, pain and suffering, social stigma, mental anguish, disfigurement, loss of enjoyment of life and other hedonic damages; pecuniary losses such as her lost earnings and lost earning capacity due to the years of sex trafficking and recovery; necessary future expenses to re-establish L.O. in society and recover a normal life despite the fear, stigma, shame, scars from abuse, and mental anguish from being a sex-trafficking victim.

245. L.O. is further entitled to attorneys' fees and costs for bringing this claim, as well as punitive damages and restitution.

### C. Count Three: Civil Action for Trafficking in Persons pursuant to Va. Code Ann. § 8.01-42.4 (Against all Defendants)

246. L.O. realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as fully set forth herein.

247. Defendants have each (and among them jointly and severally) violated Va. Code Ann. § 8.01-42.4, *Civil action for trafficking in persons*, and therefore, are liable to L.O. for "compensatory damages, punitive damages, and reasonable attorney fees and costs."

248. L.O., as a victim of commercial sex trafficking, is entitled to bring a claim under Va. Code § 8.01-42.4.

249. Va. Code § 8.01-42.4 incorporates Va. Code § 18.2-357.1, as a predicate violation, among others,[16] which provides:

a. A. Any person who, with the intent to receive money or other valuable thing or to assist another in receiving money or other valuable thing from the earnings of a person from prostitution or unlawful sexual intercourse in violation of § 18.2-346 [Prostitution; commercial sexual conduct, penalties], solicits, invites, recruits, encourages, or otherwise causes or attempts to cause a person to violate § 18.2-346 is guilty of a Class 5 Felony.

b. B. Any person who violates subsection A through the use of force, intimidation, or deception is guilty of a Class 4 Felony.

250. Defendants intended to receive money and other valuable things, or to assist others in receiving the same, from L.O.'s sex trafficking.

251. Defendants invited, encouraged, or otherwise caused or attempted to cause the commercial sex acts that occurred during L.O.'s sex trafficking.

252. Tom Roe and Jake Roe would not have been able to carry out their trafficking scheme of L.O. without the participation of Defendants.

253. Each Defendant hotel venture, including Wyndham Franchisors, G6 Franchisors, and Choice Franchisors, were using a facility or means of interstate commerce, such as interstate wire communications via the internet and banking system, and so owned, managed or operated an

[16] Va. Code Ann. § 8.01-42.4, civil action for trafficking in persons, applies to violations of the following Viginia Codes allowing a plaintiff to bring a civil action: § 18.2-47; § 18.2-48; § 18.2-348; § 18.2-348.1; § 18.2-349; § 18.2-355; § 18.2-356; § 18.2-357; § 18.2-357.1; § 18.2-368; or § 18.2-346.01.

interactive computer service for all facets of its business, including performing banking, reservations, video surveillance, and communications with guests and non-guests.

254. Each Defendant hotel venture intentionally facilitated or knowingly promoted or had good reason to believe promoted prostitution in its hotels with full knowledge, or good reason to believe, that such prostitution was occurring and did nothing to stop it or curb it, and if they were actually unaware that their actions contributed to the trafficking of L.O., then the Defendants' actions, including the actions of Wyndham Franchisors, G6 Franchisors, and Choice Franchisors, were reckless in their lack of awareness or were willfully blind.

255. On information and belief, and based on the above-alleged circumstances, each Defendant was aware of, had good reason to believe, or was willfully blind to Tom Roe's and Jake Roe's, as well as their associates' treats, force, and violence toward L.O. in their apparent efforts to obtain L.O.'s forced commercial sex acts and labor in their efforts to restrict L.O.'s personal liberty.

256. L.O. is entitled to the damages she has suffered, including, but not limited to, pain and suffering, social stigma, mental anguish, disfigurement, loss of enjoyment of life and other hedonic damages; pecuniary losses such as her lost earnings and lost earning capacity due to the years of sex trafficking and recovery; necessary future expenses to re-establish L.O. in society and recover a normal life despite the fear, stigma, shame, scars from abuse, and mental anguish from being a sex-trafficking victim.

257. L.O. is further entitled to attorneys' fees and costs for bringing this claim, as well as punitive damages and restitution.

**D. COUNT FOUR: PERSONAL TRESPASS BY COMPUTER (AGAINST ALL DEFENDANTS)**

258. L.O. realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as fully set forth herein.

259. Defendants used their respective computer networks to cause physical injury to L.O. in violation of Va. Code § 18.2-152.7A.

260. Defendants provided the essential computer network connectivity that allowed L.O.'s traffickers to operate. Upon information and belief, these services were provided in violation of the written terms and conditions of service, and contrary to law.

261. Accordingly, L.O. is entitled to damages pursuant to Va. Code § 8.01-40.1.

**E. Count Five: Civil Conspiracy Va. Code § 18.2-500 (Against All Defendants)**

262. L.O. realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as fully set forth herein.

263. L.O. is entitled to relief under Va. Code § 18.2-500 for the conspiratorial actions of all of the Defendants, predicated on their violations of Va. Code § 18.2-499, which states in part:

a. Any two or more persons who combine, associate, agree, mutually undertake or concert together for the purpose of (i) willfully and maliciously injuring another in his reputation, ... by any means whatever or (ii) willfully and maliciously compelling another to do or perform any act against his will, or preventing or hindering another from doing or performing any lawful act, shall be jointly and severally guilty of a Class I misdemeanor. Such punishment shall be in addition to any civil relief recoverable under § 18.2-500.

264. The Defendants associated with one another for the purposes of profiting from sex patronage, knowing that such commercial sex acts would involve preventing or hindering L.O.

and similarly situated victims from removing themselves from their respective traffickers, handlers, pimps, etc.

### F. **<u>Count Six: Intentional Infliction of Emotional Distress (Against all Defendants)</u>**

265. L.O. realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as fully set forth herein.

266. At all times relevant, each of the defendant hotel ventures acted intentionally and/or recklessly through their servants, agents, and employees, and the Wyndham Franchisors, G6 Franchisors, and Choice Franchisors were the agents of their respective franchisee hotels (or vice-versa), and their acts and omissions were all in the scope of their employment or agency.

267. Defendants' conduct was outrageous and intolerable by community standards of decency. As the L.O. was a hotel guest, albeit unwillingly due to her trafficking ordeal, at each hotel ventures' respective hotel property, each Defendant, including Wyndham Franchisors, G6 Franchisors, and Choice Franchisors, had a duty of care to take reasonable precautions not to harbor or provide a safe haven for the sex trade and thus sex trafficking, which is a repugnant crime. Instead, Defendants intentionally conducted a method of business to attract or provide a climate for assaultive crimes, while knowing that third party crimes against guests were reasonably foreseeable. Without limiting the generality of the forgoing, Defendants had a duty to:

a. Have knowledge of the signs of sex trafficking;

b. Deny service to persons reasonably likely to request accommodations for sex trafficking purposes;

c. Have an awareness or a good reason to believe of the degree of prostitution taking place in their hotels;

d. Recognizing when vulnerable persons, including L.O., could be the victims of sex trafficking;

e. Provide adequate incentives to hotel employees, servants, or agents not to acquiesce to or, worse, facilitate the sex trade in their hotels;

f. Provide adequate training to hotel employees and agents to avoid facilitating sex trade businesses and prostitution in their hotels in states where prostitution is illegal[17];

g. Properly train employees, servants, and agents for dealing with suspected prostitution or sex trafficking, including alerting law enforcement, in light of the warning signs provided by government authorities and common sense;

h. Properly monitor and record their hotels' public areas via cameras, security, or other means to ensure the safety of their guests; and

i. Recognize when a guest is under the influence of substances, present under force or coercion, or otherwise incapacitated to the point of not being in control of themselves and, therefore, unable to escape or consent to any sexual activity.

268. Each Defendant breached their duty, causing severe emotional distress in L.O.

269. Each Defendant knew, should have known, or had good reason to believe of the risks to L.O. when arranging their affairs to profit from her exploitation.

270. Each Defendant knew or should have known of the emotional distress and abuse suffered by L.O. due to the force, manipulation, and exploitation by Tom Roe and Jake Roe in the presence of each Defendant or their agents, servants, or employees, in the sex trafficking plan, scheme, or venture.

[17] Under Virginia Law, prostitution or solicitation is a criminal offense. *See* Va. Code Ann. § 18.2-346.

271. At all times herein mentioned, Defendants and each of them knew of the regulations and laws cited herein, and knew that the well-being and health of their guests were at risk whenever they failed to meet such duties.

272. Each Defendant hotel venture knew or should have known that their routine failure to adhere to their duties created an unacceptable risk of severe injury and emotional distress to L.O. and others like her.

273. Each Defendant's actions (whether directly or through their agents, servants, or employees) were done with knowledge of, intentions of, reckless disregard of, or willful blindness to what was occurring to L.O., and Defendants' agents, servants, or employees' active participation in allowing L.O. to be exploited in the sex trade.

274. The act of sex trafficking or involvement in the sex trade is conduct that is outrageous or intolerable. Each Defendant's conduct alleged herein demonstrates intentional conduct, reckless disregard, or willful blindness to L.O., her health and safety, and her plight. Thus, Defendants' deplorable conduct subjected L.O. to cruel and unjust hardship in conscious disregard of L.O.'s rights.

275. As a further result of Defendants' conduct, L.O. was forced to endure great pain, mental anguish, shock, manipulation, humiliation, feelings of helplessness, anxiety, and depression during the entirety of her trafficking ordeal.

276. Each Defendant acted with clear intentions, reckless disregard of, or willful blindness to the high probability that L.O. would suffer severe emotional distress, knowing (or having a good reason to believe) that L.O. was being subjected to Tom Roe's and Jake Roe's abusive conduct, both physical and emotional. Each Defendant was well aware of the propensity for abuse and violence taking place in their hotels.

277. L.O. suffered several years' worth of severe emotional distress, including humiliation, mental and emotional suffering, anguish, fright, horror, nervousness, grief, anxiety, worry, shock, and shame, and she continues to live with it, and will likely have to live with it for the rest of her life. She lacks the means and insurance to seek proper treatment. Each Defendant's acts and omissions were a substantial factor in causing L.O.'s severe emotional distress.

278. Each Defendant's acts or omissions were the result of oppression, clear intention, reckless disregard, willful blindness, or malice against L.O. because they were recklessly indifferent or willfully blind to L.O.'s well-being.

279. L.O. is entitled to the damages she has suffered, including but not limited to, her lost earnings and lost earning capacity due to the decade she lost since she was first sex trafficked by Tom Roe and Jake Roe; the fact that she was not able to make any money or have the chance to develop a career of her own and have a normal life; the fact that she now has to live with the fear, stigma, shame, scars from abuse, and mental anguish from being a sex trafficking victim and the pain, suffering, and physical scars of her plight, her extreme emotional distress, and her physical injuries.

280. L.O. is further entitled to attorneys' fees and costs for bringing this claim, as well as punitive damages and restitution.

**G. Count Seven: Gross Negligence, Negligence (Against all Defendants)**

281. L.O. realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as fully set forth herein.

282. Each Defendant owed L.O. a duty of care to take reasonable measures to ensure that L.O., among other guests, was not being subjected to sex trafficking and criminal abuse, including physical and mental abuse, on their premises when their method of business attracted or

provided a climate for assaultive crimes, while knowing such third party crimes against guests were reasonably foreseeable.

283. Each Defendant breached this duty, causing injury to L.O.

284. At all times relevant, each of the Defendant hotel ventures acted through their agents, servants, and employees, and the Wyndham Franchisors, G6 Franchisors, and Choice Franchisors were the agents of their respective franchisee hotels (or vice versa), and their acts and omissions were all in the scope of their employment or agency.

285. As L.O. was a hotel guest, albeit unwillingly due to her trafficking ordeal, at each hotel ventures' respective hotel property, each Defendant, including Wyndham Franchisors, G6 Franchisors, and Choice Franchisors, had a duty of care to take reasonable precautions not to harbor or provide a safe haven for the sex trade and thus sex trafficking. Instead, Defendants conducted a method of business attractive to criminals, while knowing that third party crimes against guests were reasonably foreseeable under the circumstances. Without limiting the generality of the forgoing, Defendants had a duty to:

a. Have knowledge of the signs of sex trafficking;

b. Deny service to persons reasonably likely to request accommodations for sex trafficking purposes;

c. Have an awareness or a good reason to believe of the degree of prostitution taking place in their hotels;

d. Recognizing when vulnerable persons, including L.O., could be the victims of sex trafficking;

e. Provide adequate incentives to hotel employees, servants, or agents not to acquiesce to or, worse, facilitate the sex trade in their hotels;

f. Provide adequate training to hotel employees and agents to avoid facilitating sex trade businesses and prostitution in their hotels in states where prostitution is illegal[18];

g. Properly train employees, servants, and agents for dealing with suspected prostitution or sex trafficking, including alerting law enforcement, in light of the warning signs provided by government authorities and common sense;

h. Properly monitor and record their hotels' public areas via cameras, security, or other means to ensure the safety of their guests;

i. Recognize when a guest is under the influence of substances, present under force or coercion, or otherwise incapacitated to the point of not being in control of themselves, and therefore, unable to escape or consent to any sexual activity.

j. Properly review employee performance and terminate employees who violate company policies designed for the safety of guests.

286. Each Defendant knew or should have known of the risks to L.O. At all times herein mentioned, Defendants and each of them knew of the need for the regulations and laws and that the lives and health of their guests, including L.O., were at risk whenever they failed to meet such duties.

287. Each Defendant hotel venture knew, should have known, or had good reason to believe that their routine failure to adhere to their duties created an unacceptable risk of severe injury and emotional distress to L.O. and others like her.

288. Each Defendant's actions or omissions (whether directly or through their agents, servants, or employees) were done with negligent disregard of what was occurring to L.O., and

[18] Under Virginia Law, prostitution or solicitation is a criminal offense. *See* Va. Code Ann. § 18.2-346.

Defendants' employees' conduct in allowing L.O. to be prostituted or sex trafficked. Defendants' conduct alleged herein demonstrates negligent or reckless disregard for L.O., her health and safety, and her plight. Thus, Defendants' despicable conduct subjected L.O. to cruel and unjust hardship in conscious disregard of L.O.'s rights.

289. Each Defendant acted with negligent or reckless disregard of the probability that L.O. would suffer injury, whether physical or emotional, knowing or having good reason to believe that L.O. was being subjected to Tom Roe's and Jake Roe's abusive conduct—physical, emotional, and mental. Each Defendant was well aware of the propensity for abuse and violence taking place in their hotels. As a result of Defendants' conduct, L.O. was forced to endure great pain, mental anguish, shock, humiliation, feelings of helplessness, anxiety, and depression for the entire trafficking period.

290. L.O. has suffered several years' worth of severe injuries, including but not limited to, bruises, scars, disfigurements, and venereal diseases in addition to severe emotional distress, including humiliation, mental and emotional suffering, anguish, fright, horror, nervousness, grief, anxiety, worry, shock, and shame, and she continues to live with it and will likely have to live with these injuries for the rest of her life. She lacks the means and insurance to seek proper treatment. Each Defendant's acts and omissions were a substantial factor in causing L.O.'s severe physical injuries and emotional distress.

291. As a direct and proximate result of the acts or omissions of Defendants, L.O. sustained severe and serious harm, and all to her damage in sum within the jurisdiction of this Court and to be shown according to proof.

292. Due to their negligence, each Defendant is therefore liable for damages she has suffered, including, but not limited to her lost earnings and lost earning capacity due to the decade

she lost since she was first sex trafficked by Tom Roe and Jake Roe; the fact that she was not able to make any money or have the chance to develop a career of her own and have a normal life; the fact that she now has to live with the fear, stigma, shame, scars from abuse, and mental anguish from being a sex trafficking victim and the pain, suffering, and physical scars of her plight, her extreme emotional distress, and her physical injuries, including, but not limited to the scars along her neck, arms, and wrists as well as the countless bruises and venereal diseases.

293. All such damages are the foreseeable and proximate result of the Defendants' acts or omissions.

294. Each Defendant's acts and omissions proximately caused L.O. to suffer and continue to suffer from her scars and disfigurement, as well as anguish, fright, horror, nervousness, grief, anxiety, worry, shock, humiliation, and shame, such that an ordinary, reasonable person would be unable to cope with it.

295. Each Defendant's negligent acts or omissions were a substantial factor in causing L.O.'s severe injuries.

296. L.O. is further entitled to attorneys' fees and costs for bringing this claim, as well as punitive damages and restitution.

**H. Count Eight: Negligent Infliction of Emotional Distress (Against all Defendants)**

297. L.O. realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as fully set forth herein.

298. Each Defendant owed L.O. a duty of care to take reasonable measures to ensure that L.O. was not being subjected to sex trafficking and criminal abuse, including physical and mental abuse, on their premises.

299. Each Defendant breached this duty, causing both physical and emotional harm.

300. At all times relevant, each of the Defendant hotel ventures acted through their agents, servants, and employees, and the Wyndham Franchisors, G6 Franchisors, and Choice Franchisors were the agents of their respective franchisee hotels (or vice versa), and their acts and omissions were all in the scope of their employment or agency.

301. As the L.O. was a hotel guest, albeit unwillingly due to her trafficking ordeal, at each hotel ventures' respective hotel property, each Defendant, including Wyndham Franchisors, G6 Franchisors, and Choice Franchisors, had a duty of care to take reasonable precautions not to harbor or provide a safe haven for the sex trade and thus sex trafficking. Without limiting the generality of the forgoing, Defendants had a duty to:

a. Have knowledge of the signs of sex trafficking;

b. Deny service to persons reasonably likely to request accommodations for sex trafficking purposes;

c. Have an awareness or a good reason to believe of the degree of prostitution taking place in their hotels;

d. Recognizing when vulnerable persons, including L.O., could be the victims of sex trafficking;

e. Provide adequate incentives to hotel employees, servants, or agents not to acquiesce to or, worse, facilitate the sex trade in their hotels;

f. Provide adequate training to hotel employees and agents to avoid facilitating sex trade businesses and prostitution in their hotels in states where prostitution is illegal[19];

---

[19] Under Virginia Law, prostitution or solicitation is a criminal offense. *See* Va. Code Ann. § 18.2-346.

g. Properly train employees, servants, and agents for dealing with suspected prostitution or sex trafficking, including alerting law enforcement, in light of the warning signs provided by government authorities and common sense;

h. Properly monitor and record their hotels' public areas via cameras, security, or other means to ensure the safety of their guests; and

i. Recognize when a guest is under the influence of substances, present under force or coercion, or otherwise incapacitated to the point of not being in control of themselves, and therefore, unable to escape or consent to any sexual activity.

j. Properly review employee performance and terminate employees who violate company policies designed for the safety of guests.

302. Each Defendant knew or should have known of the risks to L.O. At all times herein mentioned, Defendants and each of them knew of the need for the regulations and laws and that the lives and health of their guests, including L.O., were at risk whenever they failed to meet such duties.

303. Each Defendant hotel venture knew, should have known, or had good reason to believe that their routine failure to adhere to their duties created an unacceptable risk of severe injury and emotional distress to L.O. and others like her.

304. Each Defendant's actions or omissions (whether directly or through their agents, servants, or employees) were done with negligent disregard of what was occurring to L.O., and Defendants' employees' conduct in allowing L.O. to be prostituted or sex trafficked. Defendants' conduct alleged herein demonstrates negligent or reckless disregard for L.O., her health and safety, and her plight. Thus, Defendants' despicable conduct subjected L.O. to cruel and unjust hardship in conscious disregard of L.O.'s rights.

305. Each Defendant acted with negligent or reckless disregard of the probability that L.O. would suffer emotional distress, knowing or having good reason to believe that L.O. was being subjected to Tom Roe's and Jake Roe's abusive conduct—physical, emotional, and mental. Each Defendant was well aware of the propensity for abuse and violence taking place in their hotels. As a result of Defendants' conduct, L.O. was forced to endure great pain, mental anguish, shock, humiliation, feelings of helplessness, anxiety, and depression for the entire trafficking period.

306. L.O. has suffered several years' worth of severe emotional distress, including humiliation, mental and emotional suffering, anguish, fright, horror, nervousness, grief, anxiety, worry, shock, and shame, and she continues to live with it and will likely have to live with it for the rest of her life. She lacks the means and insurance to seek proper treatment. Each Defendant's acts and omissions were a substantial factor in causing L.O.'s severe emotional distress.

307. As a direct and proximate result of the acts or omissions of Defendants, L.O. sustained severe and serious harm, including, but not limited to, severe emotional distress, and all to her damage in sum within the jurisdiction of this Court and to be shown according to proof.

308. Due to their negligence, each Defendant is therefore liable for damages she has suffered, including, but not limited to her lost earnings and lost earning capacity due to the decade she lost since she was first sex trafficked by Tom Roe and Jake Roe; the fact that she was not able to make any money or have the chance to develop a career of her own and have a normal life; the fact that she now has to live with the fear, stigma, shame, scars from abuse, and mental anguish from being a sex trafficking victim and the pain, suffering, and physical scars of her plight, her extreme emotional distress, and her physical injuries, including, but not limited to the scars along her neck, arms, and wrists as well as the countless bruises and venereal diseases.

309. All such damages are the foreseeable and proximate result of the Defendants' acts or omissions.

310. Each Defendant's acts and omissions proximately caused L.O. to suffer and continue to suffer anguish, fright, horror, nervousness, grief, anxiety, worry, shock, humiliation, and shame, such that an ordinary, reasonable person would be unable to cope with it.

311. L.O. continues to have trouble obtaining work or sustaining herself financially.

312. Each Defendant's negligent acts or omissions were a substantial factor in causing L.O.'s severe emotional distress.

313. L.O. is further entitled to attorneys' fees and costs for bringing this claim, as well as punitive damages and restitution.

## III. EQUITABLE TOLLING

314. L.O. pleads that this action is timely as to all pleaded occurrences because the claims did not accrue until the last wrongful act. L.O.'s incapacity and inability to bring a claim tolls the statute of limitations until she became free from Tom Roe's and Jake Roe's threats and influence, including the extraordinary circumstances of her approximately seven years of servitude and the time needed to obtain the housing stability to diligently pursue her rights. As a matter of justice, Defendants should be estopped from raising the statute of limitations as a defense, and any statute is equitably tolled.

## IV. DEMAND FOR JURY TRIAL

315. Plaintiff respectfully requests a trial by jury on all triable issues.

## V. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff L.O. demands judgment against Defendants Wyndham Hotels and Resorts, Inc., Ramada Worldwide, Inc., L A B H, Inc., Days Inn Worldwide Inc., Sun

Norfolk LLC, G6 Hospitality LLC, G6 Hospitality Property LLC, Motel 6 Operating, L.P., Choice Hotels International, Inc., LIAM LLC, The Ramsey-White Company, L.C., R & J Petro, Inc., John Does 1-100 (names being fictitious); and ABC Corporations 1-100 (names being fictitious) and entry of judgment in Plaintiff's favor, awarding the Plaintiff as follows:

a. A protective order of confidentiality and sealing and protecting Plaintiff's identity;

b. Actual damages in an amount to be determined by the trier of fact;

c. Compensatory damages, whether direct or indirect, in the amount to be determined by the trier of fact;

d. Punitive damages to be determined by the trier of fact;

e. Restitution and/or disgorgement in an amount to be determined by the trier of fact;

f. Attorneys' fees and costs; and

g. Any other legal or equitable relief to which Plaintiff is justly entitled.

Dated: July 15, 2026

Respectfully submitted,

**PLAINTIFF L.O.**

*_/s/ Christopher M. Seelie_*
Patrick H. O'Donnell (VSB No. 29637)
Christopher M. Seelie (VSB No. 99544)
KAUFMAN & CANOLES, P.C.
150 W. Main Street, Suite 2100
Norfolk, VA 23510
T: (757) 624-3000
F: (888) 360-9092
patrick.odonnell@kaufcan.com
christopher.seelie@kaufcan.com

Kevin N. Colquitt (*Pro Hac Vice Forthcoming*)
(TXB No. 24072047)
SBAITI & COMPANY PLLC

3102 Maple Avenue, Suite 400
Dallas, TX 75201
T: (214) 214-3400
F: (214) 853-4367
knc@sbaitilaw.com
george.padis@sbaitilaw.com

Matthew B. Sicheri (*Pro Hac Vice Forthcoming*)
(NJB No. 256102018)
SBAITI & COMPANY NJ LLC
100 Mulberry Street
3 Gateway Center, Suite 1102
Newark, NJ 07102
T: (973) 954-2000
F: (973) 954-9710
matthew.sicheri@sbaitilaw.com

*Counsel for Plaintiff L.O.*